CASE NO.: 22-16440

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

KIRSTIN BLAISE LOBATO,

        Plaintiff-Appellee,

  vs.

LAS VEGAS METROPOLITAN POLICE DEPARTMENT; THOMAS THOWSEN; AND JAMES LAROCHELLE,

        Defendants-Appellants.

Appeal from the United States district court
District of Nevada, Las Vegas
Case No.: 2:19-CV-01273-RFB-EJY

## DEFENDANTS-APPELLANTS' OPENING BRIEF

Marquis Aurbach
Craig R. Anderson, Esq.
Nevada Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
canderson@maclaw.com
*Attorneys for Defendants-
Appellants, Las Vegas Metropolitan
Police Department, Thomas
Thowsen, and James LaRochelle*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendant-Appellant Las Vegas Metropolitan Police Department ("LVMPD") is a governmental entity and has no corporate affiliation.

Defendants-Appellants Thomas Thowsen and James LaRochelle are individuals.

Defendants-Appellants are represented in this Court and the district court by Craig R, Anderson, Esq. of Marquis Aurbach.

Dated this 21st day of February, 2023.

MARQUIS AURBACH


By */s/ Craig R. Anderson*
    Craig R. Anderson, Esq.
    Nevada Bar No. 6882
    10001 Park Run Drive
    Las Vegas, Nevada 89145
    *Attorneys for Defendants-Appellants, Las Vegas Metropolitan Police Department, Thomas Thowsen, and James LaRochelle*

# TABLE OF CONTENTS

I.    INTRODUCTION ...........................................................................1

II.   JURISDICTIONAL STATEMENT ...........................................3

    A.    BASIS FOR THE DISTRICT COURT'S AND THIS COURT'S JURISDICTION. ......................................................................3

    B.    FILING DATES TO ESTABLISH TIMELINESS OF APPEAL. ........3

    C.    THE COURT'S PENDENT APPELLATE JURISDICTION. ..............4

III.  STATEMENT OF ISSUES PRESENTED FOR REVIEW ...........................4

IV.   STATEMENT OF THE CASE .....................................................5

    A.    THE MURDER OF DURAN BAILEY. ................................................5

    B.    THE DETECTIVES' INVESTIGATION. ...........................................6

        1.    Lobato identified as a suspect, consents to an interview, and is arrested. ..................................................................6

        2.    The Detectives' witness interviews. .........................................10

        3.    The Detectives' official reports. ...............................................14

        4.    Det. Thowsen's additional investigation. ................................16

    C.    LOBATO'S CRIMINAL PROCEEDINGS. .......................................17

        1.    Lobato's preliminary hearing. ...................................................17

        2.    Lobato's 2002 criminal trial. .....................................................18

        3.    Lobato's second criminal trial (2006). .....................................23

MAC:14687-221 4875089_6.docx

4.  The 2017 evidentiary hearing. .................................................25

D.  AFTERMATH. ....................................................................26

E.  PROCEDURAL HISTORY OF THIS LAWSUIT. ...........................27

V.  SUMMARY OF ARGUMENT ....................................................29

VI.  STANDARDS OF REVIEW ........................................................30

A.  SUMMARY JUDGMENT STANDARD OF REVIEW. ...................30

B.  QUALIFIED IMMUNITY STANDARD OF REVIEW. ...................30

VII.  ARGUMENT ..............................................................................30

A.  THIS COURT HAS JURISDICTION TO REVIEW THE
DISTRICT COURT'S DENIAL OF THE DETECTIVES'
QUALIFIED IMMUNITY DEFENSE. .............................................30

B.  THE DISTRICT COURT ERRED IN FAILING TO GRANT THE
DETECTIVES QUALIFIED IMMUNITY ON LOBATO'S §1983
FABRICATION OF EVIDENCE CLAIM ........................................33

1.  Relevant Fourteenth Amendment fabrication of evidence
law. ........................................................................................34

2.  The Detectives did not fabricate evidence. ...............................35

3.  Lobato also cannot establish but-for causation. ........................46

4.  The law was not clearly established. ........................................48

C.  THE DISTRICT COURT ERRED IN FAILING TO GRANT
QUALIFIED IMMUNITY ON LOBATO'S §1983 CONTINUED
DETENTION WITHOUT PROBABLE CAUSE CLAIM .................53

1.  Relevant Fourth Amendment law. ...........................................53

-ii-

2.      Analysis of Lobato's Fourth Amendment lack of probable cause claim. ..................................................................54

D.      THE DISTRICT COURT ERRED IN FAILING TO GRANT QUALIFIED IMMUNITY ON LOBATO'S §1983 CONSPIRACY CLAIM. ...............................................................................56

1.      Relevant conspiracy law. ...........................................57

2.      Analysis of Lobato's civil conspiracy claim. ...........................58

E.      THE DISTRICT COURT ERRED IN FAILING TO DISMISS LOBATO'S REMAINING STATE CLAW CLAIMS. ......................59

1.      This Court has pendent jurisdiction over the state law claims. ..................................................................59

2.      This Court should grant summary judgment on the state law claims. ..................................................................60

VIII.  CONCLUSION................................................................63

MAC:14687-221 4875089_6.docx

# TABLE OF AUTHORITIES

## CASES

*Adcock v. Chrysler Corp.*,
166 F.3d 1290 (9th Cir. 1999) ............................................................30

*Arc of California v. Douglas*,
757 F.3d 975 (9th Cir. 2014) ..................................................... 59, 60

*Ashcroft v. al-Kidd*,
563 U.S. 731 (2011) ............................................................................31

*Awabdy v. City of Adelanto*,
368 F.3d 1062 (9th Cir. 2004) ............................................................47

*Baker v. McCollan*,
443 U.S. 137 (1979) ............................................................................53

*Barlow v. Ground*,
943 F.2d 1132 (9th Cir. 1991) ............................................................51

*Beck v. City of Upland*,
527 F.3d 853 (9th Cir. 2008) ..................................................... 46, 53

*Blanford v. Sacramento Cnty.*,
406 F.3d 1110 (9th Cir. 2005) ............................................................30

*Blankenhorn v. City of Orange*,
485 F.3d 463 (9th Cir. 2007) ..............................................................52

*Borunda v. Richmond*,
885 F.2d 1384 (9th Cir. 1988) ............................................................52

*Brady v. Maryland*,
373 U.S. 83 (2009) ..............................................................................25

MAC:14687-221 4875089_6.docx

*Bryan v. McPherson*,
  630 F.3d 805 (9th Cir. 2010)................................................................30

*Caldwell v. City and Cty. of San Francisco*,
  889 F.3d 1105 (9th Cir. 2018) ................................... 34, 35, 46, 47, 52

*Cefalu v. Village of Elk Grove*,
  211 F.3d 416 (7th Cir. 2000)................................................................57

*Consolidated Generator-Nevada, Inc. v. Cummins Engine Co., Inc.*,
  971 P.2d 1251 (Nev. 1988) ..................................................................57

*Constanich v. Dep't of Soc. & Health Servs.*,
  627 F.3d 1101 (9th Cir. 2010) ............................................................35

*Costanich v. Dept. of Social and Health Services*,
  627 F.3d 1101 (9th Cir. 2010) ............................................................50

*Devereaux v. Abbey*,
  263 F.3d 1070 (9th Cir. 2001) ............................................... 34, 49, 50

*Dutt v. Kremp*,
  844 P.2d 786 (Nev. 1992) ....................................................................61

*Estate of Anderson v. Marsh*,
  985 F.3d 726 (9th Cir. 2021)....................................................... 30, 31

*Fazaga v. FBI*,
  965 F.3d 1015 (9th Cir. 2020) ............................................................59

*Freeman v. Santa Ana*,
  68 F.3d 1180 (9th Cir. 1995)...............................................................53

*Gausvik v. Perez*,
  345 F.3d 813 (9th Cir. 2003)............................... 34, 43, 45, 46, 49, 51

*George v. Morris*,
  736 F.3d 829 (9th Cir. 2013)....................................................... 31, 32

*Harper v. City of Los Angeles*,
    533 F.3d 1010 (9th Cir. 2008) ...........................................................46

*Hart v. Parks*,
    450 F.3d 1059 (9th Cir. 2006) ...........................................................54

*Hasbrouck v. Yavapai Cty.*,
    2021 WL 321894 (D. Az. Feb. 1, 2021) .............................................58

*Heck v. Humphrey*,
    512 U.S. 477 (1994) ...........................................................................61

*Hofmann v. City and Cty. of San Francisco*,
    870 F.Supp.2d 799 (N.D. Cal. 2012) .................................................58

*Huskey v. City of San Jose*,
    204 F.3d 893 (9th Cir. 2000).............................................................60

*Johnson v. Jones*,
    515 U.S. 304 (1995)...........................................................................30

*Kennedy v. Allied Mut. Ins. Co.*,
    952 F.2d 262 (9th Cir. 1991).............................................................42

*Lacy v. County of Maricopa*,
    631 F.Supp.3d 1183 (D.Az. 2008).....................................................56

*Lal v. California*,
    746 F.3d 1112 (9th Cir. 2014) ...........................................................48

*LaMantia v. Redisi*,
    118 Nev. 27, 38 P.3d 877 (2002) ................................................. 60, 61

*Lassiter v. City of Bremerton*,
    556 F.3d 1049 (9th Cir. 2009) ...........................................................60

*Liston v. City of Riverside*,
    120 F.3d 965 (9th Cir. 1997)..............................................................48

MAC:14687-221 4875089_6.docx

*Lobato v. State*,
281 P.3d 1196 (Nev. 2009) ...................................................................24

*Lobato v. State*,
385 P.3d 618 (Nev. 2016) .....................................................................25

*Lobato v. State*,
96 P.3d 765 (Nev. 2004) .......................................................................23

*Lovell v. Chandler*,
303 F.3d 1039 (9th Cir. 2002) ..............................................................30

*Manuel v. Joliet*,
580 U.S. 357 (2017) ..............................................................................53

*McSherry v. City of Long Beach*,
560 F.3d 1125 (9th Cir. 2009) ..............................................................50

*Meredith v. Oregon*,
321 F.3d 807 (9th Cir. 2003) .................................................................59

*Mirch v. Clifton*,
2015 WL 6681231 (Nev. 2015) .............................................................61

*Mueller v. Auker*,
576 F.3d 979 (9th Cir. 2009) ...................................................................4

*Nev. Credit Rating Bureau, Inc. v. Williams*,
88 Nev. 601, 503 P.2d 9 (1972) ............................................................61

*Newman v. Cty. of Orange*,
457 F.3d 991 (9th Cir. 2006) .................................................................47

*Peck v. Montoya*,
51 F.4th 877 (9th Cir. 2022) ..................................................................31

*Peng v. Mei Chin Penghu*,
335 F.3d 970 (9th Cir. 2003) .................................................................33

MAC:14687-221 4875089_6.docx

*Plumhoff v. Rickard*,
    572 U.S. 765 (2014) ........................................................................................31

*Rabkin v. Dean*,
    856 F.Supp. 543 (N.D. Cal. 1994) ....................................................................58

*Rashid v. Albright*,
    818 F. Supp. 1354 (D. Nev. 1993) ....................................................................60

*Richards v. Cty. of San Bernardino*,
    2022 WL 2292830 (9th Cir. June 24, 2022) ......................................................42

*Richards v. Cty. of San Bernardino*,
    39 F.4th 562 (9th Cir. 2022) .............................................................................34

*Roybal v. Toppenish Sch. Dist.*,
    871 F.3d 927 (9th Cir. 2017).............................................................................32

*Ruble v. Escola*,
    898 F.Supp.2d 956 (N.D. Ohio 2012)................................................................58

*Scafidi v. Las Vegas Metro Police Dep't.*,
    966 F.3d 960 (9th Cir. 2020).............................................................................55

*Scott v. Harris*,
    550 U.S. 372 (2007) ................................................................................... 31, 32

*Shafer v. Cty. of Santa Barbara*,
    868 F.3d 1110 (9th Cir. 2017) ..........................................................................48

*Shiels v. City of New York*,
    141 A.D. 3d 421, 35 N.Y.S. 3d 330 (1st Dept. 2016)........................................62

*Sloman v. Tadlock*,
    21 F.3d 1462 (9th Cir. 1994).............................................................................47

*Smiddy v. Varney*,
    665 F.2d 261 (9th Cir. 1981)....................................................................... 35, 46

*Smith v. Gomez*,
 550 F.3d 613 (7th Cir. 2008)................................................................57

*Spencer v. Peters*,
 857 F.3d 789 (9th Cir. 2017)............................... 32, 34, 35, 38, 41, 43, 45, 46, 50

*Star v. Rabello*,
 97 Nev. 124, 625 P.2d 90 (1981) .......................................................62

*Stuart v. City of Scottsdale*,
 2021 WL 977166 (D.Az. March 16, 2021).........................................58

*Swint v. Chambers County Commission*,
 514 U.S. 35 (1995)................................................................................4

*Ting v. United States*,
 927 F.2d 1504 (9th Cir. 1991) ...........................................................57

*Tuuamalemalo v. Greene*,
 946 F.3d 471 (9th Cir. 2019)..............................................................31

*United States v. Stanert*,
 762 F.2d 775 (9th Cir. 1985)..............................................................48

*Wilkinson v. Torres*,
 610 F.3d 546 (9th Cir. 2010)..............................................................32

*Williams v. Cty. of Monterey*,
 2021 WL 1376029 (N.D. April 12, 2021) .........................................51

## CONSTITUTIONAL PROVISIONS

Fourteenth Amendment .................................................... 3, 27, 29, 34, 49

Fourth Amendment ........................................................................... 53, 54

U.S. Constitution, Article III.......................................................................3

MAC:14687-221 4875089_6.docx

## RULES

FRAP 4(a)(1)(A) ...................................................................................................3

## STATUTES

28 U.S.C. §1331 ...................................................................................................3

28 U.S.C. §1343 ...................................................................................................3

28 U.S.C. §1367 ...................................................................................................3

28 U.S.C. §2107(a) ..............................................................................................3

42 U.S.C. §1983 ....................... 1, 2, 3, 5, 18, 27, 28, 29, 33, 35, 46, 53, 57, 58, 60

42 U.S.C. §1985 .................................................................................................58

42 U.S.C. §1985(3) ............................................................................................59

## TREATISES

Prosser & Keaton, LAW OF TORTS (1984)..............................................................61

Prosser, LAW OF TORTS (4th ed. 1971) ................................................................61

RESTATEMENT (SECOND) OF TORTS §§ 440 *et. seq.*...............................................46

MAC:14687-221 4875089_6.docx

# I.    INTRODUCTION

This is a 42 U.S.C. §1983 wrongful conviction lawsuit in which the Defendants-Appellants appeal the district court's denial of qualified immunity.

On July 8, 2001, Duran Bailey ("Bailey") was brutally murdered in Las Vegas, Nevada. During the crime, Bailey's penis was severed from his body. LVMPD detectives Thomas Thowsen ("Det. Thowsen") and James LaRochelle ("Det. LaRochelle") (collectively "the Detectives") were assigned the case and kept the severed penis fact from the public. Two weeks after the murder, an informant told the Detectives that a teacher-friend of hers reported that one of her former students had cut off the penis of a man who attempted to rape her in Las Vegas. That student was Plaintiff-Appellee Kirstin Lobato ("Lobato"). The Detectives traveled to Lobato's home and interviewed her ("the Interview"). Lobato told the Detectives she had been attacked by a man in Las Vegas and that she "tr[ied] to cut [his penis] off but I don't know if I actually did." The Detectives arrested Lobato for Bailey's murder.

Two separate juries found Lobato guilty of Bailey's murder. Years later, the Supreme Court of Nevada overturned Lobato's conviction finding *that her criminal defense attorneys* failed to retain an expert who could challenge the State's time of death. Despite the State's continuing belief in Lobato's guilt, the State recognized that "by the time a third trial could proceed, [Lobato] would be

MAC:14687-221 4875089_6.docx

immediately eligible for parole if convicted again" and dismissed all charges. Lobato has never been declared innocent of Bailey's murder. After the State dropped the criminal charges, Lobato filed this §1983 suit.

The remaining issue in this §1983 case is very narrow. Lobato alleges that the Detectives violated her constitutional rights by fabricating evidence. According to Lobato, the Detectives, in their official reports, omitted or mischaracterized four statements she made during her Interview. Lobato alleges the Detectives: (1) omitted her statement that her attack occurred on a different day (i.e., the timing of her attack); (2) mischaracterized her statement as to where her attack occurred (i.e., the location of her attack); (3) omitted portions of her physical description of her attacker (i.e., the physical characteristics of her attacker); and, (4) in one report, misrepresented the injury she inflicted on her attacker (i.e., the nature of her attack). As a result, Lobato alleges that prosecutors were misled into pursuing charges.

The district court denied the Detectives' request for qualified immunity finding that a jury could conclude the Detectives fabricated evidence. The Detectives do not (because they cannot) contest the sufficiency of Lobato's evidence or the district court's factual findings. Rather, it is the Detectives' position that viewing all facts in the light most favorable to Lobato, she cannot establish a constitutional violation for three reasons. First, despite the alleged

fabrication, there is no admissible evidence the Detectives continued their investigation despite knowing Lobato was innocent as substantial evidence pointed towards her guilt. Second, it is undisputed the prosecutor reviewed Lobato's Interview and made an independent decision that probable cause existed. Third, even if Lobato pled a constitutional violation, in 2001 there was no clearly established law prohibiting the Detectives' actions because it is undisputed they provided their entire file to the prosecutor.

## II.  JURISDICTIONAL STATEMENT

### A.  BASIS FOR THE DISTRICT COURT'S AND THIS COURT'S JURISDICTION.

The district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1343, and 1367 because Lobato's Fourth Amendment and Fourteenth Amendment claims arise under 42 U.S.C. §1983. The supplemental state law claims are so related to the federal claims that they form the same case or controversy under Article III of the U.S. Constitution.

### B.  FILING DATES TO ESTABLISH TIMELINESS OF APPEAL.

The appealed order is the district court's September 1, 2022 Order Granting in Part Defendants' Motion for Summary Judgment. 1-ER-002-30. The notice of appeal was timely filed on September 19, 2022, pursuant to 28 U.S.C. §2107(a) and FRAP 4(a)(1)(A), which provide that a notice of appeal must be filed within

MAC:14687-221 4875089_6.docx

thirty days of entry of the judgment or order from which the appeal is taken. 21-ER-4958-4959.

## C. THE COURT'S PENDENT APPELLATE JURISDICTION.

Appellants also request that this Court reverse the district court's denial of summary judgment on Lobato's state law civil conspiracy, malicious prosecution, abuse of process, and intentional infliction of emotional distress ("IIED") claims. In appeals involving the denial of qualified immunity, this Court has taken the view that other parties and claims that are necessary to resolving the appealable order also become appealable by virtue of the pendent jurisdiction doctrine. *See Swint v. Chambers County Commission*, 514 U.S. 35 (1995). This Court has followed *Swint* when other claims are inextricably intertwined with the resolution of the qualified immunity issue. *See e.g.*, *Mueller v. Auker*, 576 F.3d 979 (9th Cir. 2009) (*Mueller* stands for the proposition that separate claims that are sufficiently related invoke this Court's pendent jurisdiction to exercise appellate jurisdiction over issues that may not be appealable when standing alone). Pendent appellate jurisdiction is discussed in further detail *infra* in Section VII(E)(1).

## III. STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether this Court has jurisdiction over this appeal from an order denying qualified immunity.

2.	Whether the district court erred by denying the Detectives qualified immunity on Lobato's §1983 fabrication of evidence claim when the facts, taken in the light most favorable to Lobato, establish that: (1) Lobato's constitutional rights were not violated because the Detectives did not fabricate evidence; (2) the prosecutor made an independent decision to pursue the charges; and (3) at a minimum, the law prohibiting the Detectives' actions was not clearly established in 2001.

3.	Whether the district court erred by denying the Detectives qualified immunity on Lobato's §1983 lack of probable cause claim when Lobato is collaterally estopped from pursing the claim, and the undisputed facts establish that a "fair probability" existed (and still exists) that Lobato was involved in the crime.

4.	Whether the district court erred by denying the Detectives qualified immunity on Lobato's §1983 civil conspiracy claim when the claim is untenable as a matter of law under the intra-corporate conspiracy doctrine.

5.	Whether this Court has jurisdiction over Lobato's Nevada state law claims because the claims are inextricably intertwined with the §1983 claims.

## IV.	**STATEMENT OF THE CASE**

### A.	**THE MURDER OF DURAN BAILEY.**

On July 8, 2001, Richard Shott was dumpster diving in the area of 4240 West Flamingo Road when he discovered a dead body behind a dumpster. Police

later identified the body as that of Duran Bailey, a homeless man. Bailey had suffered stab wounds, a fractured skull, missing teeth, lacerations to his anus and scrotum, and, importantly, a severed penis. The death was labeled a homicide that occurred on July 8th. 1-ER-003.

## B. THE DETECTIVES' INVESTIGATION.

The Detectives were assigned to the Bailey homicide investigation. They traveled to the site of the homicide, supervised the documenting of the scene, and interviewed witnesses.

### 1. Lobato identified as a suspect, consents to an interview, and is arrested.

#### a. Lobato identified as a suspect.

The Detectives purposefully kept the fact that Bailey's penis had been severed from the public. 9-ER-2085, 2088. On July 20, 2001, almost two weeks post-murder, Det. Thowsen received a call from Laura Johnson ("Johnson"), a Juvenile Probation Officer in Lincoln County, Nevada. 11-ER-2394. Johnson told Det. Thowsen that a friend of hers, Dixie Tienken ("Tienken"), a school teacher in Lincoln County, Nevada, had reported one of her former students, Lobato, had cut off the penis of a man who tried to rape her. Johnson reported Lobato was concerned someone may have seen her car and was hiding it at her parents' house in Panaca, Nevada located in Lincoln County. *Id.* Det. Thowsen learned Lobato was 18 years old and a prior sexual assault victim in 1989. *Id.* The Detectives

travelled the 170 miles to Panaca and met with Johnson and obtained a statement. 11-ER-2420-2433. Johnson warned the Detectives not to contact Tienken prior to meeting with Lobato because Tienken would likely warn Lobato. 11-ER-2395.

### b.    Lobato consents to a recorded interview.

That same day (July 20, 2001), the Detectives traveled to Lobato's residence. Det. Thowsen noticed Lobato's red Pontiac Fiero with the distinctive license plate "4NIK8ER" parked on the street. Upon meeting Lobato, Det. Thowsen introduced himself and Det. LaRochelle as LVMPD homicide investigators. 11-ER-2395.

Det. Thowsen began by telling Lobato he understood she had been attacked in Las Vegas and defended herself. *Id.* He also told her that her vehicle's license plate "is very distinct." *Id.* Lobato responded someone might have been borrowing her car at the time of the incident. Lobato agreed to an interview and signed a Miranda card. 11-ER-2434-2436; 11-ER-2474-2475. The Detectives audio recorded the Interview. 11-ER-2499-2526. Lobato agrees the Interview is truthful and accurate, and she has no complaints about how the Detectives treated her. 11-ER-2476, 2482.

After starting the recording, Det. Thowsen stated to Lobato that "you were explaining to us what happened *a couple of weeks ago* in Las Vegas." 11-ER-2501 (emphasis added). Lobato agreed with a "Uh-huh." *Id.* Lobato then told the

Detectives she had been on a three-day drug binge and had just parked her car in a parking lot she believed was at a Budget Suites on Boulder Highway (i.e., a location on the *east side* of Las Vegas). 11-ER-2519. Lobato admitted she might be mistaken about the location because "I don't remember a lot" (11-ER-2504) and that "it's possible" she was wrong about the location because she did not know Las Vegas "very well" (11-ER-2514). As she exited her car, an older black man who smelled "like old alcohol and dirty diapers" threw her down and attempted to rape her. She described her assailant as "really big…like a giant compared to me."[1] Lobato retrieved a butterfly knife from the rear pocket of her skirt and then she just "snapped" and "everything goes black from then on." 11-ER-2504. Lobato told the Detectives that "I cut his penis, I remember that" and that "I was trying to cut it off but I don't know if I actually did." 11-ER-2505. She claimed when she left, her assailant "was on the ground" and "crying." 11-ER-2503-2504. Lobato said "I didn't think anybody would miss somebody like that." 11-ER-2507.

Lobato admitted there was a dumpster "not far from where it happened but I don't remember putting him it or anything. I don't think there's any way that I could have." 11-ER-2515. Also, when asked if she hit the assailant with anything

---

[1] At the time of the incident, Lobato was 5'6" and 100 pounds. 11-ER-2504. According to the medical examiner, Bailey was 5'10" and 133 pounds. 1-ER-015.

MAC:14687-221 4875089_6.docx

besides the knife, Lobato responded "No, but it's poss - I have a baseball bat that I keep behind my seat or had a baseball bat." 11-ER-2521.

Lobato said she threw away her clothes, got rid of the knife, and hid her car at ex-boyfriend, Jeremy Davis's ("Davis") house with a note that said: "I had done something bad and I had to be gone for a while." 11-ER-2508-2509. Lobato also reported going to a Catholic church afterward. 11-ER-2509. At the very end of her statement, Lobato stated her attack occurred "over a month ago." 11-ER-2526.

### c. The Detectives arrest Lobato and take her to jail.

Det. Thowsen placed Lobato under arrest for Bailey's murder. 11-ER-2396. He showed Lobato a photo of Bailey that caused Lobato to tear up, but she said she could not recognize him because she had put him out of her mind. *Id.* As they were leaving, Lobato's step-mother, Rebecca Lobato, returned home. 11-ER-2396. Lobato told Rebecca, "Mom, I did it, now I have to do what I have to do." A short time later, Lobato's father, Larry Lobato, also arrived home. The Detectives explained Lobato was under arrest for homicide. Lobato told Larry, "I'm sorry, Daddy, told you I did something awful." Larry denied any knowledge of the homicide. 11-ER-2396-2397.

Lobato was transported to jail. On the trip, Lobato told the Detectives the knife she used to cut the man's penis was a gift from her father. She also asked to take her prescribed Prozac, which the Detectives allowed. Det. Thowsen noted the

prescription was dated July 13, 2001. 11-ER-2397. At the jail, Lobato was placed in a holding cell where she made the unprovoked comment the cell enclosure reminded her of the location where her attack occurred. Det. Thowsen agreed the cell closely resembled the garbage enclosure where Bailey was found. 11-ER-2397. [Lobato admitted to this conversation during her 2002 trial (17-ER-3713-3714), but she now denies it occurred (11-ER-2476).]

## 2. The Detectives' witness interviews.

### a. Dixie Tienken.

On July 26, 2001, the Detectives met with Tienken at her residence and took a recorded statement. 11-ER-2527-2552. Tienken relayed she was a former teacher of Lobato, and Lobato arrived at her home during the early morning hours of July 10th or 11th. 11-ER-2530-2531. She noticed Lobato was driving her dad's truck and not her red Pontiac. 11-ER-2531. Lobato told her that she did not want anyone to see her car because they might recognize it from the incident. *Id.* Tienken told the Detectives that Lobato was known to carry and use knives. 11-ER-2535.

According to Tienken, Lobato told her "I did something bad and I need a hug." 11-ER-2531. She then told Tienken that an "old and smelly" man tried to hit on her. 11-ER-2533. Lobato told Tienken she cut the man's penis off, "threw it," that "it was a mess" and got "ick on her." 11-ER-2533-2536. *Lobato told Tienken the assault occurred on the west side of Las Vegas on either West Flamingo or*

West Tropicana and it occurred "between buildings or in an alley." 11-ER-2532. (Bailey was murdered on West Flamingo.) Tienken said Lobato "did not think she ever killed anybody." 11-ER-2547. Lobato reported leaving the scene, cleaning up at a friend's house, and then driving home to Panaca the same night. 11-ER-2538. *It was Tienken's impression the incident "had just happened a day or two before" the visit.* 11-ER-2539. Tienken acknowledged she told Lobato's story to Laura Johnson. 11-ER-2549-2550.

### b. Lobato's alibi witnesses.

Lobato provided the Detectives a list of alibi witnesses. On July 26, 2001, the Detectives, located and recorded interviews of all of Lobato's alibi witnesses except one. 11-ER-2401.

Michele Austria ("Austria") recalled that at some point during the week of July 2nd-8th, Lobato told her she was attacked in Las Vegas and slashed a person's penis. 12-ER-2672. Lobato did not tell her where the incident occurred, nor did she describe the man. 12-ER-2676. Austria knew Lobato used a knife and said Lobato "pretty much figured that she had killed him." 12-ER-2677. It was Austria's assumption the incident occurred "within the first couple of weeks or sometime before" Lobato returned to Panaca in July, but Lobato never told her a date. 12-ER-2678. Lobato was "very upset" and told her that due to the incident she began taking medication for depression. 12-ER-2672 & 2676-2677.

MAC:14687-221 4875089_6.docx

Paul Rusty Brown ("Brown"), Austria's boyfriend, said he was present for Lobato and Austria's conversation. Brown disagreed with Austria's dates and recalled the conversation occurring the week before Lobato's arrest on July 20, 2001. 12-ER-2687. He recalled Lobato saying a man was molesting her, so she grabbed a knife and cut his penis off. *Id.*

Heather McBride ("McBride") recalled that sometime after the July 4th weekend, she was at home with her boyfriend, Chris Collier ("Collier"), when Lobato came for a visit. 12-ER-2693. Lobato arrived in "her dad's truck." 12-ER-2699. During the visit, Lobato told her she used a butterfly knife to stab a man in the abdomen who "did her wrong." 12-ER-2694. Lobato left without knowing whether her attacker was dead or alive. *Id.* Lobato did not tell her when or where the incident occurred. 12-ER-2694-2695. McBride described Lobato's demeanor as "down" and "very not normal." 12-ER-2699. Lobato also told McBride people in Las Vegas hired her to go out and beat up people who had done them wrong on a drug deal. 12-ER-2695.

Collier recalled the visit occurring between July 9th and 11th. 12-ER-2703. He claimed to be certain of the date because it occurred between a softball tournament and his brother's birthday. 12-ER-2704. Lobato arrived in her dad's truck and told a story of how she stabbed a large, black male and left him not

knowing the outcome. 12-ER-2705. The incident happened in Las Vegas, and Lobato was "tweakin" on methamphetamine. 12-ER-2706.

In addition to the witnesses provided by Lobato, the Detectives also interviewed alibi witnesses Catherine Reininger ("Reininger") and Douglas Twining ("Twining").

On August 2, 2001, Reininger was interviewed while incarcerated. Reininger admitted both she and boyfriend, Stephen Pyszkowksi ("Pyszkowski"), had had a sexual relationship with Lobato, and all three lived together. 11-ER-2577. She last saw Lobato in late June/early July. According to Reininger, Lobato told her in May 2001 that she "beat someone up and chopped his dick off." 11-ER-2589. Reininger said Lobato did this because the guy had tried to attack Lobato's sister. 11-ER-2591. Reininger was the first witness to place Lobato's alleged attack in May 2001.

Also, on August 2, 2001, the Detectives met with Lobato's boyfriend, Twining. Twining admitted he had spoken to Lobato's father, Larry, prior to meeting with the Detectives. Twining claimed Lobato was continuously in Panaca from July 2nd through July 8th. 12-ER-2606-2607. On July 9th, he drove to Panaca and picked Lobato up at 12:45 a.m. and left to return her to Las Vegas at 1:10 a.m. 12-ER-2607-2608. Twining claimed around the end of May or first part of June, Lobato said she "cut a guy's penis." 12-ER-2611. He had never told

anyone this story because he did not believe she was serious. Twining admitted to being in love with Lobato and threatening suicide when she told him she wanted to go back to Panaca on July 2nd. 12-ER-2622-2623. After Twining picked Lobato up on July 9th, she stayed with him until July 13th, when Lobato's father came to pick her up. 12-ER-2609. From July 9th through July 13th, Twining admitted he and Lobato "tried to lay, lay low because, you know, she didn't want to deal with [Pyszkowski and Reininger's] bullshit." *Id.* He admitted they did not leave his place except to get food. Twining also admitted they watched news stories on the Bailey homicide. 12-ER-2610.

### 3. The Detectives' official reports.

As a result of their investigation, the Detectives created the two reports that are the focus of this lawsuit: (1) the Officer's Report (11-ER-2379-2407) and (2) the Arrest Report (21-ER-4836-4838).

### a. The Officer's Report.

The Detectives finalized their Officer's Report on August 22, 2001. 11-ER-2380. Relevant to this lawsuit, the Officer's Report summarized Lobato's Interview. First, the Officer's Report is silent on the date of Lobato's attack. The Officer's Report did not include the inculpatory information that Lobato agreed the event she was discussing occurred "a couple of weeks ago", and it does not include the exculpatory information Lobato said her attack occurred "over a month ago."

MAC:14687-221 4875089_6.docx

Despite omitting this information, the Officer's Report clearly puts the reader on notice an issue exists regarding the date of Lobato's alleged attack. The Officer's Report acknowledges Austria, Reininger, McBride, and Twining all provided dates inconsistent with the Detectives' theory of the case. 11-ER-2398-2407.

Second, with respect to the location of the attack, the Officer's Report accurately stated Lobato "believed" the incident occurred "at a Budget Suites near Flamingo and Boulder Highway" (i.e., the east side of Las Vegas). 11-ER-2395. Lobato conceded it was possible she was wrong about the location because she did not know Las Vegas "very well at all" and she "did not remember a lot." 11-ER-2504, 2514.

Third, with respect to the description of Lobato's attacker, the Officer's Report said Lobato described him as an "older, smelly, black male." 11-ER-2395. The Detectives did not include Lobato's words he "seemed like a giant to me" and "really large."

Fourth, in discussing the nature of the attack, the Officer's Report states Lobato "grabbed his penis and testicles with her left hand and 'cut it off' with her right hand." 11-ER-2396. Lobato had told the Detectives "I cut his penis, I remember that" and that "I was trying to cut it off but I don't know if I actually did." 11-ER-2505. The Officer's Report contained the statements from Lobato's

MAC:14687-221 4875089_6.docx

alibi witnesses reporting differing injuries Lobato said she inflicted. Thus, any reader would easily recognize any discrepancies surrounding this issue.

### b. The Arrest Report.

The Detectives also drafted an Arrest Report. First, with respect to the timing of Lobato's alleged attack, the Arrest Report, similar to the Officer's Report, does not refer to Lobato's inculpatory statement (affirming the incident occurred "a couple of weeks ago") or her exculpatory statement (stating it occurred "over a month ago"). 21-ER-4838. Second, in addressing the location of Lobato's attack, the Arrest Report accurately states Lobato "thought that the incident had occurred on the east side of Las Vegas, however, she appeared unsure because of her using methamphetamine at the time and her unfamiliarity with the city." 21-ER-4838. Third, with respect to her attacker's characteristics, it states Lobato "described the black male as smelling bad." *Id.* It did not include her subjective impression the attacker "seemed like a giant" and was "really big." Fourth, and finally, in discussing the nature of the attack, the report accurately reported Lobato "grabbed the male subject's penis with her left hand and cut it." *Id.*

### 4. Det. Thowsen's additional investigation.

After the Detectives submitted their case file to the prosecutors, the prosecutors asked the Detectives to conduct additional investigation. 9-ER-1982-

1983, 1996. Specifically, Det. Thowsen investigated whether anyone reported a cut penis from May to July 2001, and he visited the Boulder Suites in east Las Vegas.

At the time of the homicide, Nevada law required healthcare providers to report any injuries involving the use of a knife or firearm. Det. Thowsen, with the assistance of his staff, researched all police records (from all local police agencies) and contacted local hospitals and healthcare providers to determine whether anyone had reported any stab injuries to the groin area. 9-ER-1982-1983, 1996. He did not locate any such injuries for the months of May, June, or July 2001. *Id.*

Det. Thowsen also traveled to the Budget Suites where Lobato claimed she was attacked in May 2001. At the Budget Suites, Det. Thowsen spoke to the manager and learned it had 24-hour security, there were no reports of a stabbing having occurred there, and there was no evidence of a crime scene. 9-ER-2007-2008.

## C. LOBATO'S CRIMINAL PROCEEDINGS.

### 1. Lobato's preliminary hearing.

On August 7, 2001, Lobato's preliminary hearing was held. At the hearing, Tienken, medical examiner Dr. Lary Simms, and Det. Thowsen testified. 7-ER-1393-1465. At the conclusion of the testimony, the presiding judge held "there is sufficient cause to believe that Kirstin Blaise Lobato is responsible for those

crimes and you're hereby ordered to be held over to answer to the charges in the Eighth Judicial district court…." 7-ER-1456. Lobato is not aware of any false information being presented at the preliminary hearing. 11-ER-2484.

### 2. Lobato's 2002 criminal trial.

Lobato's first criminal trial occurred in May 2002. 12-ER-2759-18-ER-4192. At the trial, the State argued Lobato murdered Bailey. Lobato denied committing the murder, set forth a theory she had injured another man in May 2001 at a Budget Suites, and argued the State was conflating the two events. Lobato presented the same arguments to the jury she is now making in this §1983 lawsuit.

#### a. Trial testimony relevant to this lawsuit.

##### (1) Testimony regarding the timing of Lobato's attack.

Lobato took the stand. She denied killing Bailey and testified she was in Panaca on the date of the homicide. 17-ER-3692. She testified during her Interview she agreed with the Detectives the assault she was discussing occurred "a couple of weeks ago" because "I didn't catch the couple of weeks ago part." 17-ER-3741. At the very end of the interview, she told the Detectives her incident occurred "over a month ago." 17-ER-3697-3698. Lobato testified (in contradiction to her Interview)

she had no trouble "remembering details about the attack" and, for the first time, that it occurred Memorial Day weekend. 17-ER-3698.

Tienken testified that on a Wednesday in July 2001, Lobato came to her house and said "I need to talk to you, I did something bad." 13-ER-3051. Lobato told her she cut off the penis of a man who tried to rape her. 13-ER-3054-3058. It was Tienken's impression Lobato was discussing an event that occurred "shortly before" the visit. 13-ER-3054. Johnson confirmed Tienken told her the story on July 18, 2001. 13-ER-3082.

Michele Austria testified Lobato told her about an attack where she "slashed" a man's penis. 14-ER-3108. Austria placed the conversation the "weekend after" the Fourth of July. 13-ER-3100. Austria said Lobato told her due to the incident, she had begun taking anti-depressants. 14-ER-3106. (Lobato began taking anti-depressants July 13, 2001. 19-ER-4206.) Austria's boyfriend, Paul Brown, contradicted Austria's timeline and said the conversation "definitely" occurred "[a]bout a week before" Lobato's July 20th arrest. Lobato told Austria "she reached down and … cut off [her attacker's] penis". 14-ER-3215-3126.

Heather McBride testified, on a date between July 1st and July 4th, Lobato told her she had "stabbed someone in the abdomen" and did not know if the person died because "she didn't stick around to find out." 14-ER-3269-3271. She admitted

this differed from the date she told the Detectives, but since that meeting, "I had time to go back and think about it." 14-ER-3279.

During Det. Thowsen's testimony, the State played Lobato's Interview in its entirety to the jury. 14-ER-3198. Det. Thowsen was questioned about Lobato's Interview comment that the event she was discussing occurred "over a month ago." 14-ER-3221-3226, 3243-321.

### (2) Testimony regarding the location of Lobato's attack.

Lobato testified her attack occurred in an open parking lot at a Boulder Suites on the east side of Las Vegas. 17-ER-3698-3702. The jury listened to her Interview stating the same. 14-ER-3198. Although the Budget Suites' parking lot was very populated, Lobato did not scream or otherwise seek help. 17-ER-3787-3789. Lobato admitted that, after she was arrested, she was placed in a holding cell at jail where she told Det. Thowsen the cell reminded her of where the attack occurred. 17-ER-3713-3714. She told the jury she was actually referring to a "cave" located at the Budget Suites. 17-ER-3714, 3758-3759. [She now denies this conversation ever happened. 1-ER-010.]

Tienken testified Lobato told her the attack occurred "off of like a hotel [named] street" and "it could have been [Desert Inn], Flamingo, Tropicana…" and agreed Lobato told her it occurred on the west side. 13-ER-3064-3065.

MAC:14687-221 4875089_6.docx

Zachory Robinson, an assistant general manager with the Budget Suites, testified. 18-ER-4062-4063. He testified to the Budget Suites being a busy 24-hour business, and the spot where Lobato claimed to have been assaulted was within view of the front office. 18-ER-4062-4067. Robinson also testified the hotel had 24-hour security. 18-ER-4073. He found no reports of a man being assaulted with his penis being slashed, and, if there had been, management would have "absolutely" been made aware. 18-ER-4066-4068.

No alibi witnesses testified Lobato ever told them her attack occurred at a Boulder Suites or on the east side of Las Vegas.

### (3) Testimony regarding her attacker's characteristics.

Lobato described her attacker as a large, older black man. 17-ER-3698-3702. Her Interview statement describing her attacker as "really big…like a giant compared to me" was played for the jury. Tienken testified Lobato told her the attacker was a "smelly man." 13-ER-3054-3056. No other witness testified to Lobato describing the physical characteristics of her attacker.

### (4) Testimony regarding the nature of her attack.

Lobato testified after being pushed to the ground, she grabbed her knife and "just reached for whatever I could grab for down there and I cut." 17-ER-3703. She now denied knowing where she cut the man. 17-ER-3703-3704. She said she

never hit the man with anything, and, when she left, he was alive and "crying." 17-ER-3704. She testified any witnesses claiming she confessed to cutting her attacker's penis were inaccurate. 17-ER-3747-3750. Lobato's Interview was played, and the jury heard her say "I cut his penis, I remember that" and that "I was trying to cut it off but I don't know if I actually did." They also heard her statements that she "snapped," could not recall anything else and that "I didn't think anybody would miss somebody like that."

Tienken testified Lobato told her "[s]he got her knife out…grabbed [her attacker's] penis and she said that she cut it off" and gestured that she just threw it. 13-ER-3057-3058. Lobato told her she wanted to get the "ick" off of her so she went to an unknown friend's house to clean up and then went home to Panaca because she was concerned someone saw her car. 13-ER-3058-3059.

Laura Johnson testified Tienken told her Lobato had been in Las Vegas where "a man tried to attack her with his penis hanging out of his pants and that [Lobato] had cut off his penis." 13-ER-3084.

Brown testified to hearing Lobato tell Austria "she was attacked or - by a man and she used - she defended herself with a knife and…[s]he reached down and…cut off his penis." 14-ER-3123.

McBride testified Lobato told her "[t]hat someone had done her wrong and she had stabbed [them] in the abdomen," and she did not know if the person died

Page 22 of 67

because "she didn't stick around to find out." 14-ER-3270-3271. McBride did not believe Lobato "[b]ecause she tends to exaggerate." *Id.*

### b. The Verdict.

On May 18, 2002, the jury returned its verdict. The jury found Lobato guilty of first-degree murder with use of deadly weapon and sexual penetration of a human body. 18-ER-4187.

### c. The Appeal of the 2002 Criminal Trial.

Lobato appealed her conviction to the Supreme Court of Nevada. *See Lobato v. State*, 96 P.3d 765 (Nev. 2004). The Nevada Supreme Court held that the trial court erred in not allowing Lobato to impeach a jailhouse informant's testimony and remanded the case for a new trial. The Court found Lobato's complaints against the Detectives were "without merit." *Id.*, 96 P.3d at 772-73.

### 3. Lobato's second criminal trial (2006).

Lobato's second trial for the murder of Duran Bailey occurred in September of 2006. 7-ER-1561 – 11-ER-2367. For this trial, Lobato retained new defense counsel. The same prosecutors handled the prosecution.

### a. The 2006 evidence.

The evidence at the 2006 trial involving the Detectives' investigation and reports were generally the same as the 2012 trial. The fact witness testimony was also similar. The primary differences included:

MAC:14687-221 4875089_6.docx

- Lobato did not testify, but her entire Interview was played for the jury (9-ER-1973);

- Tienken was now a hostile witness for the state, adding to her testimony that Lobato also told her the attacker was "big" (7-ER-1611-1612, 1634-1635);

Lobato called additional forensic experts and several new alibi witnesses who testified to her presence in Panaca on July 8th. These new witnesses included Lobato's sister and father, Larry Lobato, who, despite claiming to be alibi witnesses, did not bother to testify at the 2002 trial.

### b. The Verdict.

On October 6, 2006, the jury found Lobato guilty of Voluntary Manslaughter with Use of a Deadly Weapon and Sexual Penetration of a Dead Human Body.

### c. The Appeal of the 2006 verdict.

Lobato's initial appeal to the Nevada Supreme Court was unsuccessful. *Lobato v. State*, 281 P.3d 1196 (Nev. 2009). On August 1, 2011, Lobato filed a new appeal making four arguments: (1) the district court failed to consider new evidence of actual innocence, (2) the State failed to disclose exculpatory and

MAC:14687-221 4875089_6.docx

impeachment evidence to Lobato (i.e., a *Brady* claim[2]), (3) ineffective assistance of counsel of Lobato's criminal defense attorney, and (4) the district court failed to hold a *Brady* hearing or an ineffective assistance of counsel hearing. The Nevada Supreme Court issued an "Order Affirming in Part Reversing in Part and Remanding." *See Lobato v. State*, 385 P.3d 618 (Nev. 2016).

The Court rejected Lobato's *Brady* claims against the Detectives, finding "Lobato failed to demonstrate that the evidence was withheld by the State or that it was material, that is, that there was reasonable probability that the evidence would have affected the outcome of trial." The Court did agree with Lobato *on her ineffective assistance of counsel* claim. In that claim, Lobato "submitted affidavits from three forensic entomologists who opined" that the victim's time of death coincided with a time period that Lobato was physically in Panaca. *Id.* The Court remanded the case on these grounds.

### 4. The 2017 evidentiary hearing.

From October 9, 2017 to October 13, 2017, an evidentiary hearing was held pursuant to Lobato's post-conviction petition, "to address the alleged ineffective assistance of Defendant's trial counsel." 19-ER-4207-4262. The court issued its written Decision and Order on December 19, 2017. *Id.* After summarizing the

---

[2] *Brady v. Maryland*, 373 U.S. 83 (2009).

MAC:14687-221 4875089_6.docx

evidentiary hearing testimony, the court analyzed whether "Defendant's counsel was ineffective for failing to provide evidence that narrowed Decedent's time of death…." 19-ER-4248. First, the court found Lobato presented evidence of a valid alibi, and the time of death was "a crucial aspect of [Lobato's] case." 19-ER-4254. Second, the court concluded Lobato's own attorneys had "failed to meaningfully consult with [both] a forensic pathologist…[and] a forensic entomologist." 19-ER-4254-4261. The court ordered a new trial. 19-ER-4261. The district court did not find any wrongdoing on the part of the Detectives and did not find plaintiff innocent.

## D.    AFTERMATH.

On December 29, 2017, a hearing was held regarding the case. The State informed the court of the following:

> …the District Attorney's Office has made a decision regarding this case and that prior to dismissing it, the State would like to place the following on the record: this crime occurred in July 2001 and in May 2002 Kristin Lobato was tried for open murder with use of a deadly weapon and sexual penetration of a dead human body for the brutal murder of Duran Bailey; at the conclusion of the trial, 12 jurors unanimously rejected the Defendant's alibi and found beyond reasonable doubt that she was guilty of first degree murder…. On direct appeal, the Nevada Supreme Court reversed the Defendant's conviction in September 2004 due to an erroneous ruling the trial court made. The State was not responsible for the reversal. At the conclusion of the 2006 re-trial the Defendant was again convicted…. Once again, all 12 jurors unanimously rejected the Defendant's alibi and found beyond a reasonable doubt that Ms. Lobato was responsible for the death of Duran Bailey. [The case was again remanded in 2016

for ineffective assistance and] the State was in no way responsible for the reversal of the second trial. Now, the State was faced with the prospect of trying the case for a third time due to no fault of its own, 17 years after the crime occurred and also, by the time a third trial could proceed, the Defendant would be immediately eligible for parole if convicted again. Although the State believes in her guilt as well as 24 members of the community who unanimously found the Defendant guilty beyond a reasonable doubt, their limited resources are such that they are electing not to proceed with a third trial, considering the Defendant has served more than 15 years in prison.

20-ER-4489-4491. The charges against Lobato were dismissed with prejudiced.

After dismissal of the criminal charges, Lobato filed an application with the Clark County Conviction Review Unit ("CRU"). The CRU refused to take Lobato's case as she had not presented sufficient evidence of innocence. 20-ER-4492-4494.

### E.     PROCEDURAL HISTORY OF THIS LAWSUIT.

On July 23, 2019, Lobato filed her Complaint. 21-ER-4928-4954. The Complaint alleged ten causes of action: (1) a 42 U.S.C. §1983 Involuntary Confession claim; (2) a 42 U.S.C. §1983 Fourteenth Amendment due process claim for fabricating false evidence, withholding exculpatory evidence, and coercive investigative techniques; (3) 42 U.S.C. §1983 false arrest/malicious prosecution; (4) a 42 U.S.C. §1983 failure to intervene; (5) a 42 U.S.C. §1983 civil conspiracy; (6) state law malicious prosecution; (7) state law abuse of process;

MAC:14687-221 4875089_6.docx

(8) state law intentional infliction of emotional distress ("IIED"); (9) state law civil conspiracy; and (10) state law indemnification.

After discovery, Defendants filed a Motion for Summary Judgment on all claims. 7-ER-1469-1553. Lobato opposed the Motion (2-ER-156-159), and Defendants filed a reply (2-ER-052-072). In Lobato's Opposition she expressly abandoned her §1983 involuntary confession claim (2-ER-116 n.7; 1-ER-007) and implicitly abandoned her withholding of evidence claim. Lobato's Opposition focused exclusively on her §1983 fabrication of evidence-related claims.

On September 1, 2022, the district court granted in part and denied in part the Defendants' Motion. 1-ER-002-030. The district court dismissed Lobato's (1) §1983 involuntary confession claim, (2) §1983 failure to intervene claim (without prejudice), and (3) state law indemnification claim. The remaining claims include: (1) §1983 fabrication of evidence claim, (2) §1983 false arrest/malicious prosecution, (3) §1983 civil conspiracy, and (4) state law claims for malicious prosecution, civil conspiracy, abuse of process, and IIED.

All of the remaining claims are premised on the same allegations the Detectives fabricated evidence in their official reports. According to the district court, genuine issues of material fact exist that, if true, strip the Detectives of their qualified immunity defense.

# V.    SUMMARY OF ARGUMENT

The district court incorrectly denied the Detectives' request for summary judgment on Lobato's §1983 claims under both prongs of the qualified immunity analysis. Lobato's primary allegation is the Detectives violated her Fourteenth Amendment rights by fabricating evidence. She alleges the Detectives omitted and mischaracterized statements she made during her Interview in their official reports and, based upon these omissions and mischaracterizations, the prosecutor was misled to bring charges against her.

Accepting all disputed facts as true, and viewing them in the light most favorable to Lobato, no reasonable jury could find the Detectives violated her constitutional rights. First, there is no evidence the Detectives intentionally or deliberately fabricated evidence. Second, it is undisputed the prosecutor had actual knowledge of the alleged fabricated evidence and independently agreed probable cause still existed to pursue charges. Third, even assuming a constitutional violation occurred, in 2001 there was no clearly established law putting the Detectives on notice of the unconstitutional nature of their actions. Because all of Lobato's remaining claims are reliant on her fabrication of evidence claim, this Court should grant summary judgment on all claims - including the state law claims.

MAC:14687-221 4875089_6.docx

## VI. STANDARDS OF REVIEW

### A. SUMMARY JUDGMENT STANDARD OF REVIEW.

The district court's denial of summary judgment is reviewed *de novo*. *See Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002). This Court applies the same legal standards the district court applied in reviewing the motion for summary judgment. *Adcock v. Chrysler Corp.*, 166 F.3d 1290, 1292 (9th Cir. 1999).

### B. QUALIFIED IMMUNITY STANDARD OF REVIEW.

The district court's denial of qualified immunity is also reviewed *de novo*. *Bryan v. McPherson*, 630 F.3d 805, 823 (9th Cir. 2010) (citing *Blanford v. Sacramento Cnty.*, 406 F.3d 1110, 1114 (9th Cir. 2005)). Jurisdiction only exists to review a court's denial of qualified immunity in limited circumstances. *See Johnson v. Jones*, 515 U.S. 304, 313 (1995); *Estate of Anderson v. Marsh*, 985 F.3d 726, 732 (9th Cir. 2021). As set forth directly below, this Court has jurisdiction in this case to review the district court's denial of qualified immunity.

## VII. ARGUMENT

### A. THIS COURT HAS JURISDICTION TO REVIEW THE DISTRICT COURT'S DENIAL OF THE DETECTIVES' QUALIFIED IMMUNITY DEFENSE.

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or

MAC:14687-221 4875089_6.docx

constitutional right, and (2) that the right was 'clearly established 'at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citations omitted). Because qualified immunity is "an immunity from suit rather than a mere defense to liability," the Supreme Court has treated an order denying qualified immunity as effectively final and thus subject to immediate appeal. *Plumhoff v. Rickard*, 572 U.S. 765, 771-72 (2014). Applying qualified immunity to cases involving factual disputes "has perplexed courts for years." *See Peck v. Montoya*, 51 F.4th 877, 885 (9th Cir. 2022) (citing *Estate of Anderson*, 985 F.3d at 732). The Ninth Circuit has described its scope to limiting the review to "whether defendant[s] would be entitled to qualified immunity as a matter of law, assuming all factual disputes are resolved, and all reasonable inferences are drawn, in plaintiff's favor." *Id.* (quoting *George v. Morris*, 736 F.3d 829, 836 (9th Cir. 2013)). In *Estate of Anderson*, the rule was stated as follows: A "public official may not immediately appeal a fact-related disputed about the pretrial record, namely, whether or not the evidence in the pretrial record was sufficient to show a genuine issue of fact for trial." 985 F.3d at 731.

Another exception exists if there is "dispositive evidence that 'blatantly contradict[s]' or 'utterly discredit[s]' [the plaintiff's] side of the story." *George*, 736 F.3d at 836 (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)); *Tuuamalemalo v. Greene*, 946 F.3d 471, 476 (9th Cir. 2019). Thus, assuming the

MAC:14687-221 4875089_6.docx

non-moving party's version of the facts is correct does not require a court to accept every contention that a non-moving party makes about what the evidence shows. Rather, the court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (citing *Scott*, 550 U.S. at 380.)

Here, the Detectives accept the version of the material facts asserted by Lobato as correct. *George*, 736 F.3d at 835. The Detectives are not asking whether Lobato can prove certain facts, rather they are asking this Court to determine as a matter of law whether those admitted facts establish a claim for falsification of evidence. Also, jurisdiction is proper because Lobato must establish but-for-causation to prevail on her fabrication of evidence claim; i.e., "that the injury would not have occurred in the absence of the conduct." *See Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). That is a legal question that is subject to this Court's de novo review. *Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 931 (9th Cir. 2017).

In short, the Detectives' appeal falls squarely within the scope of appellate jurisdiction over appeals from the denial of qualified immunity. The Court may examine Lobato's Interview and the Detectives' reports and determine as a matter of law whether the alleged omissions and mischaracterizations are material and, if so, whether they were the cause of Lobato's loss of liberty.

MAC:14687-221 4875089_6.docx

Finally, the Detectives are contesting the district court's denial of qualified immunity on Lobato's §1983 false arrest/malicious prosecution claim and §1983 civil conspiracy claims. The false arrest/malicious prosecution-based claims require Lobato to establish the Detectives lacked probable cause. When the underlying facts are undisputed, probable cause is an issue of law for the court and not one of fact for the jury. *See Peng v. Mei Chin Penghu*, 335 F.3d 970, 979-80 (9th Cir. 2003). With respect to the §1983 civil conspiracy claim, the Detectives argue that no such claim exists due to the intra-corporate doctrine. Thus, this Court has jurisdiction over these claims as well.

### B. THE DISTRICT COURT ERRED IN FAILING TO GRANT THE DETECTIVES QUALIFIED IMMUNITY ON LOBATO'S §1983 FABRICATION OF EVIDENCE CLAIM.

Lobato alleges the Detectives intentionally fabricated evidence. According to Lobato, "To be clear: it is *[the Detectives'] deliberate mischaracterization* of the statements made by [Lobato] during the interrogation as being somehow related to the Bailey murder…that constitute fabrication, *not* the statements made by [Lobato] during the interrogation." 2-ER-117-118 (emphasis in original); 1-ER-008. The fabrication claims have been reduced to Lobato's Interview statements regarding the timing of her attack, the location of her attack, the characteristics of her attacker, and the nature of her attack. 1-ER-013-015; 2-ER-117-124.

MAC:14687-221 4875089_6.docx

### 1.    Relevant Fourteenth Amendment Fabrication of Evidence law.

"[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001); *Spencer*, 857 F.3d at 793 ("The Fourteenth Amendment prohibits deliberate fabrication of evidence by a state official."). The deliberate fabrication of evidence implicates a plaintiff's fundamental right to a fair trial. *See Richards v. Cty. of San Bernardino*, 39 F.4th 562, 573 (9th Cir. 2022) (citing *Devereaux*).

A plaintiff may prove deliberate fabrication by direct or circumstantial evidence. *Caldwell v. City and Cty. of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018). This is a circumstantial fabrication case. To prove a fabrication of evidence claim using circumstantial evidence, a plaintiff must show that: (1) the detectives continued their investigation "despite the fact that [they] knew or should have known that [the plaintiff] was innocent; or (2) [the detectives] used investigative techniques that were so coercive and abusive that [they] knew or should have known that those techniques would yield false information." *Id.* (quoting *Devereaux*, 263 F.3d at 1076). "The test is a stringent one." *Gausvik v. Perez*, 345 F.3d 813, 817 (9th Cir. 2003). And, a "careless or inaccurate investigation that does not ensure an error-free result does not rise to the level of a

constitutional violation." *Constanich v. Dep't of Soc. & Health Servs.*, 627 F.3d 1101, 1108 (9th Cir. 2010) (*quoting Devereaux*, 263 F.3d at 1076-77).

In addition to proving fabrication, a plaintiff must also show the fabrication was deliberate and it was the but-for-cause of the plaintiff's deprivation of liberty. *Spencer*, 857 F.3d at 798. To establish causation, "the plaintiff must show that (a) the act was the cause in fact of the deprivation of liberty, meaning the injury would not have occurred in the absence of the conduct; and (b) the act was the 'proximate cause' or 'legal cause' of the injury, meaning the injury is of a type that a reasonable person would see as a likely result of the conduct in question." *Id. See also Smiddy v. Varney*, 665 F.2d 261, 266 (9th Cir. 1981)To demonstrate injury, "a §1983 plaintiff need not be convicted on the basis of fabricated evidence to have a suffered a deprivation of liberty - being criminally charged is enough." *Caldwell*, 889 F.3d at 1115.

### 2.  The Detectives did not fabricate evidence.

At the outset, this claim fails because any alleged deliberate fabrication did not prevent Lobato from receiving a fair trial. Lobato received a fair trial as it is undisputed the alleged misrepresented statements were all found in Lobato's Interview, the entire Interview was played to both juries, and Lobato testified at the first trial. Thus, any supposed attempt to fabricate evidence from Lobato's Interview failed, as she presented the same claims she is presenting in this case at

MAC:14687-221 4875089_6.docx

both criminal trials. In addition, even accepting Lobato's allegations as true, they do not establish a constitutional violation.

> ### a. The omission of the fact that Lobato said her attack occurred "over a month ago" was not material.

The district court found "that [Lobato] has identified evidence in the record that would create a genuine dispute as to whether [the Detectives] mischaracterized [Lobato's] statements regarding the date of her attack." 1-ER-013-014. According to Lobato, the Detectives knew Lobato "was attacked over Memorial Day weekend", and they "purposefully omitted" this fact "from both the Arrest Report and Officer's Report." 2-ER-118. Lobato's argument is easily defeated on this issue.

Lobato admits she *never* told the Detectives her attack occurred over Memorial Day weekend. 11-ER-2477. It is undisputed the timing of the attack was discussed twice during the Interview. The first mention occurred at the start of the Interview. Det. Thowsen stated "you were explaining to us what happened a couple of weeks ago in Las Vegas." 11-ER-2501. Lobato responded in the affirmative with "uh-huh." *Id*. At deposition, Lobato agreed she answered the question in the affirmative but explained "I didn't know how important it was." 11-ER-2475-2477. Lobato concedes the Detectives did not coerce or trick her with the question. *Id.* The second mention of timing occurred at the very end of the

MAC:14687-221 4875089_6.docx

Interview when Lobato mentioned her attack occurred "over a month ago." 11-ER-2526. The Detectives did not follow up or respond to the statement.

The Officer's Report states Lobato reported "she had been on a three-day binge utilizing methamphetamine and had just parked her car…" when attacked (11-ER-2395), and the Arrest Report states "[w]hile in Las Vegas she was attacked by an older black male adult who had hit her when Lobato was in a parking lot near her car." 21-ER-4838. Thus, it is an undisputed fact the Detectives did not include either timing statement in their reports. But the statements were not material.

First, based upon the totality of Lobato's Interview, neither timing statement was reliable or precise. Lobato's "over a month ago statement" would place her attack around June 20th - a date closer to July 8th than to Memorial Day. Lobato cast doubt on her memory by volunteering "I don't remember a lot" and that she "was out of my mind on drugs." Thus, both statements had an air of unreliability and did not necessarily suggest any date.

What is important is the Detectives' alerted the prosecutor of the potential dispute. They did. The prosecutor knew that Austria reported Lobato told her of the attack prior to July 8th (11-ER-2401), McBride reported hearing of the attack "what she thought was [July] 5th or 6th" (11-ER-2402), Reininger stated Lobato told her that she "cut [someone's] dick off" in May 2001 (11-ER-2405), and

MAC:14687-221 4875089_6.docx

Twining told the detectives that "in the end of May or first of June, Lobato said she 'cut a guy's penis.'" (11-ER-2406). These potentially exculpatory statements clearly put the prosecutor on notice that a potential timing dispute existed.

It is also undisputed the prosecutor was provided both the audio recording and a transcription of Lobato's Interview. The prosecutor reviewed the Interview (and the other witness statements) before independently deciding to file charges. 21-ER-4833. So, Lobato's statement that her attack occurred "over a month ago" was not material because the prosecutor had actual knowledge of the statement before filing charges. At most, Lobato has established carelessness or negligence. *See Spencer*, 857 F.3d at 798 ("Mere carelessness is insufficient, as are mistakes of tone" to establish fabrication of evidence).

Also, on the timing issue, the district court took issue with two additional representations in the Arrest Report. According to the Court:

> The only two references to date or time in the Arrest Report were (1) that [] "on 07/20/01…Det. Thowsen [sic] "received information…that Kristin Blaise Lobato had told [someone]…that she was involved in a recent incident in Las Vegas where she severed the penis of a man who had attacked her"; and (2) that "on Friday, July 13th, [Lobato] returned to Panaca sometime after the incident."
>
> …
>
> "Lobato said she went back to Panaca on July 13th and contacted a doctor and was prescribed Prozac due to her depression from the incident."

1-ER-014. According to the district court, these statements constitute

"misstatement[s]" that is "both contrary to Plaintiff's allegations and it further clearly suggest Plaintiff essentially admitted to the attack on Bailey." *Id.* The district court's labeling these two statements as "mischaracterizations" is "blatantly contradicted" by the record.

First, it is undisputed on July 20th, Laura Johnson called Det. Thowsen and reported Tienken told her about Lobato's early morning July 18th visit from Lobato. It is also undisputed Lobato gave Tienken the perception that her alleged attack was "recent" and within a few days. Thus, the statement was accurate and supported by the evidence. Next, the statements regarding Lobato's doctor visit were accurate. Lobato told the Detectives she returned home to Panaca on July 13th. 11-ER-2514. Her medical records (entered into evidence at both the criminal trials) show she began to suffer from depression-type symptoms *after* Bailey's murder. According to the records, Lobato saw her doctor on July 5th because she thought she was being poisoned. *Id.*; 11-ER-2515; 19-ER-4204. The July 5th records do not mention any depression or a Memorial Day attack.[3] 19-ER-4195-4206. On July 13th, Lobato's mother called the doctor reporting *new* symptoms, including "restlessness and anxiety", and Lobato received a prescription for

---

[3] According to Lobato, the Memorial Day incident made her feel "empowered", and she never sought medical help. 11-ER-2461.

MAC:14687-221 4875089_6.docx

Prozac. 19-ER-4206; *see also* 11-ER-2397. Thus, both statements in the Arrest Report were not fabricated or misstatements. Both accurately stated the evidence.

In short, the undisputed evidence establishes that, although the "over a month ago" statement was omitted from the Detectives' reports, the same information is found elsewhere in the Officer's Report, and the prosecutor knew the discrepancy before filing charges. Lobato cannot show this evidence was fabricated or the Detectives knew or should have known Lobato was innocent due to this timing dispute.

> **b.** **The Detectives clearly put in both reports Lobato claimed her attack occurred on the east side of Las Vegas and not the west side where Bailey was murdered.**

The second fabrication of evidence argument involves the location of Lobato's attack. The district court found "that a genuine issue of fact exists as to whether Defendants mischaracterized" the location. 1-ER-014. According to Lobato, the Detectives falsely insinuated Lobato "doubted where the attack occurred" and they "omitted" from their reports "clear and unequivocal statements from [Lobato] that the attack occurred at the Budget Suites on Boulder Highway and Nellis…." 2-ER-120. In addition, Lobato also claims the Detectives fabricated evidence regarding the location of the incident by writing in the Officer's Report that Lobato "told them her cell at the jail following her arrest reminded her of the

MAC:14687-221 4875089_6.docx

location where she was attacked…." 2-ER-121. Both allegations are easily refuted as they are "blatantly contradicted" by the record.

First, it is undisputed Lobato told the Detectives her attack occurred at a Budget Suites on the east side of Las Vegas and Bailey's murder occurred near a bank on the west side of Las Vegas. Both reports acknowledge this issue. According to the Officer's Report, Lobato "believed" her attack occurred "at a Budget Suites near Flamingo and Boulder Highway" (i.e., the east side of Las Vegas). 11-ER-2395. The Arrest Report reads that "Lobato thought that the incident had occurred on the *east side* of Las Vegas, however she appeared unsure because of her using methamphetamine at the time and her unfamiliarity with the city." 21-ER-4838 (emphasis added). The statement Lobato "appeared unsure" was not just made up. Lobato told the Detectives that: "I was out of mind on drugs" (11-ER-2502), that she did not know Las Vegas "very well at all", and that "[i]t's possible [she could be mistaken of the location]." 11-ER-2514. Thus, the statement "appeared unsure" is factually accurate. Also, the Detectives personally interviewed Lobato, thus they were privy to her demeanor, body language, and behavior. These statements were "matters of opinion…that [the Detectives] could make as lay officers with [no professional human behavior training]" and even if the Detectives' observations were inaccurate, "not all inaccuracies in an investigation report give rise to a constitutional claim." *See Spencer*, 857 F.3d at

798; *Richards v. Cty. of San Bernardino*, 2022 WL 2292830, *2 (9th Cir. June 24, 2022) (Detective's lay opinions regarding his observations of a victim's body were matters of opinion and did not give rise to a constitutional claim).

Finally, the Detectives had reason to be suspicious of Lobato's location story. Tienken reported Lobato told her the attack occurred on either West Tropicana or West Flamingo (Bailey's body was found on West Flamingo). 11-ER-2401; 11-ER-2532. Thus, the Detectives had reliable evidence supporting their opinion Lobato appeared "unsure" as Lobato had told differing stories.

Second, with respect to the holding cell issue, Lobato claims the Detectives fabricated evidence by claiming she stated her holding cell resembled the area in which she was attacked. 2-ER-121. The district court labeled this a material "disputed fact." 1-ER-006, 010. This is not a disputed fact. In the 2002 criminal trial, Lobato *admitted* this conversation took place. 17-ER-3714-3715. Now, over twenty-years later, she is improperly trying to change her testimony. *See Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting prior testimony).

In sum, the undisputed evidence conclusively establishes the Detectives reported Lobato's exculpatory evidence regarding the location of her attack in both their reports.

MAC:14687-221 4875089_6.docx

### c. The characteristics of her attacker.

Lobato's third fabrication issue involves her statement about her attacker's physical characteristics. Lobato correctly states that both reports omit her subjective impression her attacker seemed "really big" and "seemed like a giant compared to me." 11-ER-2504. At the time of the incident, Lobato was 5'6" and about 100 pounds, whereas Bailey was listed as 5'10" and 133 pounds. 1-ER-015. The district court concluded that a "jury could find that Defendants intentionally omitted [this] crucial information" and that it was material. *Id.*

The Officer's Report characterizes Lobato's attacker as "an older, smelly, black" man, and the Arrest Report identified the attacker as "an older black male adult." 11-ER-2395; 21-ER-4838. Neither report included Lobato's size reference. 11-ER-2504. Lobato's statement regarding her attacker's size was relevant, but certainly not dispositive due to its subjective nature. Further, and more importantly, it cannot be seriously argued that, if the statement was included in the reports, probable cause would have been defeated and the prosecutor would have declined charges. The prosecutor reviewed Lobato's Interview before bringing charges and, therefore, was well aware of the statements and still decided to file charges. Again, "not all inaccuracies in an investigative report give rise to a constitutional claim." *Spencer*, 857 F.3d at 798; *Gausvik*, 345 F.3d at 817 (investigator's report stating victims tested positive for sexual assault when, in

MAC:14687-221 4875089_6.docx

reality, one victim's test was only suggestive of assault not a constitutional violation).

### d. The Detectives did not intentionally mischaracterize Lobato's description of her actions during her attack.

Lobato's fourth fabrication of evidence theory alleges the Detectives "falsely represent[ed] that her attack resembled the murder of Bailey." She claims the Detectives exaggerated the injuries she admitted to inflicting upon her attacker by affirmatively writing in the Officer's Report that she had "cut [her attacker's penis] off", when, in fact, she only admitted to cutting her attacker. 2-ER-122. The district court found an issue of fact existed as to whether the Detectives' reports "mischaracterized [Lobato's] statements regarding the actions she took to ward off her assailant" and "embellished [Lobato's] account" by turning a "cut" into an "amputation." 1-ER-017.

In her Interview, Lobato told the Detectives that she "cut his penis, I remember that" and that "I think I was trying to cut it off but I don't know if I actually did." 11-ER-2505. Accordingly, Lobato told the Detectives she definitely cut her attacker's penis, that her goal was to cut it off, but she was unsure if she was successful. The Officer's Report stated Lobato said "she grabbed his penis and testicles with her left hand and 'cut it off' with her right hand." 11-ER-2396. The

Arrest Report correctly reported Lobato admitted she "grabbed the male subject's penis with her left and cut it." 21-ER-4838.

The discrepancies in the two reports renders this issue non-material. The prosecutor, in reviewing both reports, would easily recognize the inconsistency on the issue. Because the prosecutor had Lobato's Interview, the discrepancy could quickly be resolved. Furthermore, there is no evidence the Officer's Report mistake was intentional. As the Officer's Report correctly pointed out, numerous witnesses claimed Lobato told them about the attack and represented Lobato told them she had severed her attacker's penis from his body. For example: Tienken claimed Lobato told her she severed the penis and "threw it" (11-ER-2536); Reininger said Lobato told her that she "chopped his dick off" (11-ER-2580); Brown reported Lobato said that she cut a penis off (12-ER-2687); and Richard Bywater "heard from a person named Jeff that [Lobato] had cut off some guy's 'member'" (11-ER-2398). Thus, the Officer's Report representation is not an intentional fabrication, but rather an inadvertent inaccuracy or the result of "mere carelessness." *Spencer*, 857 F.3d at 798; *Gausvik*, 345 F.3d at 817

### e. Summation.

Lobato has failed to establish a constitutional violation for fabrication of evidence. At most, her evidence shows "that [the Detectives] carelessly handled the facts and the investigation," but that alone is insufficient to give rise to liability

MAC:14687-221 4875089_6.docx

for deliberate fabrication. *Gausvik*, 345 F.3d at 817. And, Lobato has "not pointed to any facts showing that the [Detectives] knew [Lobato] innocent" but chose to continue their investigation with that knowledge. *Id.* Thus, summary judgment is appropriate on the merits.

### 3. <u>Lobato also cannot establish but-for causation.</u>

In order to establish a violation of her right not to be deprived of liberty based on deliberately fabricated evidence, Lobato also has to show causation. *Spencer*, 857 F.3d at 798. To satisfy the causation requirement of §1983, "the plaintiff must establish both causation-in-fact and proximate causation." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008). Lobato must show that "injury would not have occurred in the absence of the conduct." *Spencer*, 857 F.3d at 798. "Like in any proximate cause analysis, an intervening event may break the chain of causation between the allegedly wrongful act and the plaintiff's injury." *Caldwell*, 889 F.3d at 1115. *See also Beck v. City of Upland*, 527 F.3d 853, 862 (9th Cir. 2008) (citing RESTATEMENT (SECOND) OF TORTS §§ 440 *et. seq.*).

Typically, in constitutional tort cases the "[f]iling of a criminal complaint immunizes investigating officers...because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time." *Smiddy*, 665 F.2d at 266. The plaintiff bears the burden of producing evidence to rebut this presumption. *See Newman v.*

*Cty. of Orange*, 457 F.3d 991, 994-95 (9th Cir. 2006). A plaintiff's account of the incident, without more, does not overcome the presumption. *Id.* at 994 (citing *Sloman v. Tadlock*, 21 F.3d 1462, 1474 (9th Cir. 1994)). A plaintiff must provide evidence that the detectives "exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067-68 (9th Cir. 2004). "Deliberately fabricated evidence in a prosecutor's file can rebut any presumption of prosecutorial independence." *Caldwell*, 889 F.3d at 1116.

Here, the district court found that because the Detectives' reports were provided to the prosecutor, "a reasonable jury could infer that the prosecutors reviewed the [reports] as part of their decision to prosecute Plaintiff, and that the information contained within those reports had a substantial or controlling impact on their evaluation of the evidence and their theory of the case." 1-ER-018.

It is uncontroverted the prosecutor exerted her own independence to pursue charges. According to the prosecutor, she reviewed the entire homicide file and "independently concluded that probable cause existed to charge Kirstin Blaise Lobato with the homicide of Duran Bailey." 21-ER-4833. The Detectives' homicide file included, among other items, both official reports and all transcribed

witness statements. Thus, the prosecutor evaluated Lobato's Interview and her alibi witnesses' statements as part of her decision to pursue charges. In addition, the prosecutor testified Detectives never attempted to influence her decisions. *Id.* Finally, it is worth noting Lobato raised the exact same issues she is raising in this litigation at both of her unsuccessful criminal trials. The prosecutor, now well aware of Lobato's theory of the case, remains convinced Lobato committed the crime. 20-ER-4489-4491; 21-ER-4833-4844.

In sum, it is undisputed the prosecutor had actual knowledge of the evidence Lobato now claims was "fabricated." Still, she concluded probable cause existed (and still exists) to prosecute Lobato. Thus, it is undisputed the prosecutor's independent judgment severed the causational chain in this case.

### 4.    The law was not clearly established.

If the Court concludes a constitutional violation may have occurred, it must then address the second prong of the qualified immunity analysis - i.e., whether the law was clearly established. *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014). "It is the plaintiff who bears the burden of showing that the rights allegedly violated were clearly established." *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017). In denying qualified immunity, the district court cited to *Liston v. City of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997) and *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985). Neither case is factually analogous to

MAC:14687-221 4875089_6.docx

this case. Both address high-level issues, and the facts of the cases are not similar to the subject case.

### a.    The fabrication of evidence issue.

In 2001, it was clearly established an individual had a constitutional right not to be subjected to criminal charges based on fabricated evidence." *Devereaux*, at 1074-75. However, the contours of the right must have been clearly established for the Detectives in this case to understand their actions violated that general right. So, the issue is whether in 2001 it was clearly established investigators violated a suspect's Fourteenth Amendment rights by providing reports to a prosecutor that omitted or mischaracterized exculpatory evidence found in the suspect's own statement when the suspect's statement was provided contemporaneously with the report. The answer is an easy "no."

The closest case the Detectives can locate is this Court's post-2001 *Gausvik* opinion. In the 2003 *Gausvik* case, the defendant officers appealed a district court's denial of qualified immunity after the summary judgment. This Court found jurisdiction and overturned the district court. The plaintiff alleged among other things, that an officer "falsified his affidavit for probable cause" because "[t]he affidavit states [the victims] testified 'positive' for sexual abuse when, in fact, the [victim's] tests were only 'suggestive' or 'consistent' with sexual abuse." *Id.* 354 F.3d at 817. The affidavit also stated that "eight children accused Gausvik of

sexual abuse when, in fact, only two children had positively identified him to [the detective]." *Id.* Thus, the officer misrepresented test results and lied about the number of victims. This Court overturned the district court's denial of qualified immunity because plaintiff "has only shown that [the detective] carelessly handled the facts and the investigation." *Id.* It stressed that plaintiff "has not pointed to any facts showing [the detective] knew [the plaintiff] was innocent." *Id.* Further, the Court noted that while the detective's affidavit may have been careless or inaccurate, "it does not satisfy *Devereaux's* stringent test." *Id.*

This Court has provided other examples as to what can constitute a *Devereaux* claim. In *Costanich v. Dept. of Social and Health Services*, this Court found a potential violation where a social worker intentionally misquoted interviewees and falsely reported witness contacts that did not occur. In other words, the official made up facts. 627 F.3d 1101, 1111-1112 (9th Cir. 2010). In *Spencer*, a plaintiff introduced evidence that a police report "contained scores of quotations attributed to [the victims], both of whom unequivocally testified at trial that they never made those statements." The Court distinguished the officer's intentional falsehoods from mistakes of tone and carelessness. 857 F.3d at 798; *see also McSherry v. City of Long Beach*, 560 F.3d 1125, 1130 (9th Cir. 2009) (no qualified immunity where officer wholly created statements by a witness and the witness denied providing any information).

MAC:14687-221 4875089_6.docx

Here, there is no evidence of intentional falsehoods. It is not alleged the Detectives made up quotes, padded witness numbers, or attributed statements that did not exist. It is only asserted the Detectives omitted and characterized actual statements made by Lobato during her Interview in their actual reports but it is also undisputed the Interview was contemporaneously provided with the reports. At most, Lobato has generated evidence of mere carelessness or inaccuracies. *See Gausvik*, 345 F.3d at 817; *see also*, *Williams v. Cty. of Monterey*, 2021 WL 1376029, *13 (N.D. April 12, 2021) (relying on *Gausvik*, court found plaintiff failed to show omissions and inaccuracies" were intentional and at most suggested "carelessness"). Thus, summary judgment is appropriate under the second prong of the qualified immunity analysis.

### b.     The prosecutorial immunity issue.

In addition, there is no clearly established law that prosecutorial independence does not apply to the facts of this case. It is undisputed the Detectives provided all exculpatory evidence to the prosecutor with their official reports. This is important because when the presumption of prosecutorial immunity has been overcome in cases, police reports have been the only source of information provided to the prosecutors. For example, in *Barlow v. Ground*, 943 F.2d 1132 (9th Cir. 1991), "the prosecutor had only the arresting officers' police reports available to him" when he filed charges. *Id.* at 1137. In *Borunda v.*

*Richmond*, 885 F.2d 1384 (9th Cir. 1988), "[t]he criminal prosecutor had no information available to him other than that contained in the police reports submitted by the appellants." *Id.* at 1390. It is true that (after 2001) this Court has held the presumption can be rebutted when a prosecutor was provided evidence outside of the police reports. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 484-84 (9th Cir. 2007); *Caldwell*, 889 F.3d at 1112-13. But in those cases, the prosecutors either did not review the outside evidence, *see Blankenhorn*, 485 F.3d at 483 (prosecutor did not look at the video and relied solely on police reports), or the officer fabricated outside evidence, *Caldwell*, 889 F.3d at 1112-13 (concluding triable issues whether officer manufactured a show-up designed to manipulate a witness's memory and the officer fabricated a statement from the plaintiff by falsifying notes.)

Here, it is undisputed the prosecutors reviewed the Detectives' entire homicide file - including Lobato's Interview and her alibi witnesses' statements. 21-ER-4833. Thus, the prosecutors were well acquainted with Lobato's theory of the case and her alleged exculpatory evidence when deciding to pursue charges. Indeed, although the reports lacked precise quotes from Lobato's Interview, the same information that contradicted the Detectives' theory of the case was found elsewhere in the Officer's Report in the summaries of Lobato's alibi witnesses - thus the prosecutor had actual knowledge. Again, the touchstone of the inquiry

here is whether "the independence of the prosecutor's judgment has been compromised." *Beck*, 527 F.3d at 862. There is no evidence the prosecutor's judgment was compromised in this case.

**C.    THE DISTRICT COURT ERRED IN FAILING TO GRANT QUALIFIED IMMUNITY ON LOBATO'S §1983 CONTINUED DETENTION WITHOUT PROBABLE CAUSE CLAIM.**

Lobato also alleges a §1983 claim for continued detention without probable cause. She claims the Detectives arrested her without probable cause, and then continued to "perpetuate judicial proceedings against [Lobato] without probable cause…[when] they knew [Lobato] was innocent." 21-ER-4946-4947.

### 1.    Relevant Fourth Amendment law.

"The Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan*, 443 U.S. 137 (1979). In *Manuel v. Joliet*, 580 U.S. 357 (2017), the Supreme Court held that a plaintiff could challenge, on Fourth Amendment grounds, his pre-conviction detention where the judge relied on completely fabricated evidence to support a finding of probable cause. *Id.* at 365-66. A finding of lack of probable cause is necessary for the claim to survive. *Id.* at 369. The prosecutor's decision not to try Lobato for a third time in 2017 does not alter the probable cause analysis that existed in 2001. *See*, *e.g.*, *Freeman v. Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995) ("[T]he mere fact a prosecution was unsuccessful does not mean it was not supported by probable cause.")

Page 53 of 67

MAC:14687-221 4875089_6.docx

Probable cause exists when the facts and circumstances within the officer's knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the plaintiff had committed or was committing an offense." *Hart v. Parks*, 450 F.3d 1059, 1065-66 (9th Cir. 2006).

**2.    Analysis of Lobato's Fourth Amendment lack of probable cause claim.**

Here, it cannot be seriously disputed the Detectives had probable cause to arrest Lobato.

First, Lobato is collaterally estopped from pursuing this claim due to the probable cause finding at Lobato's preliminary hearing. Lobato's preliminary hearing occurred on August 7, 2001. 7-ER-1392-1465. Tienken, medical examiner Dr. Simms, and Det. Thowsen testified. 7-ER-1455-1456. At that time, Det. Thowsen had yet to complete his Officer's Report. Thus, the alleged fabricated evidence did not exist. 7-ER-1448. Lobato admits she was present and is not aware of any false evidence presented at the preliminary hearing. 11-ER-2484. At the conclusion of testimony, the court found Lobato "[has] substantial defenses that I'm sure that you're going to raise at [trial]" but "there is sufficient cause to believe that [Lobato] is responsible for those crimes…" - i.e., that probable cause existed. 7-ER-1456. This probable cause finding serves as collateral estoppel in this case

MAC:14687-221 4875089_6.docx

because Lobato has not alleged the probable cause determination was based upon "false testimony or suppressed facts." *See Scafidi v. Las Vegas Metro Police Dep't.*, 966 F.3d 960, 963-64 (9th Cir. 2020) (Under Nevada law, probable cause determination at a preliminary hearing has preclusive effect unless evidence of misrepresented facts or manipulated evidence exists). There is no evidence (or allegation) that any of the evidence presented at the preliminary hearing was misrepresented or manipulated.

Second, Lobato's own police practices expert agrees probable cause existed to arrest her. 20-ER-4531. Even Lobato admits that "perhaps" the Detectives had probable cause - but it is her opinion they still should have looked "further." 11-ER-2484.

Third, this Court can determine as a matter of law that probable cause existed for Lobato's arrest. The Detectives determined probable cause existed based upon the facts that (1) Johnson reported to Det. Thowsen that Lobato had told "a second person" (Tienken) that she "severed the penis of a man who had attacked her"; (2) Lobato herself reported being attacked by an older black man on what she believed to be "east side" of Las Vegas, and (3) Lobato reported that she "grabbed the male subject's penis…and cut it". 21-ER-4836-4838. Finally, it cannot be overlooked that it is undisputed that Lobato, in the Detectives' presence, seemingly admitted to the crime when she said: "Mom, I did it, now I have to do

what I have to do;" and "I'm sorry, Daddy, told you I did something awful." 11-ER-2397-2397. These admissions, coupled with Tienken's voluntary statement, certainly suggested a "fair probability" existed that Lobato might have committed the crime. Because probable cause existed to arrest Lobato, her false arrest claim necessarily fails, as does her unlawful detention claim. *See Lacy v. County of Maricopa*, 631 F.Supp.3d 1183, 1195 (D.Az. 2008).

Finally, it cannot be ignored Lobato received a preliminary hearing, two criminal trials, and two criminal trial appeals. During all of these proceedings, no court has ever even suggested probable cause did not exist. Indeed, even when the Nevada Supreme Court overturned her second conviction in 2017, it still remanded the case for third trial - i.e., a finding that probable cause *still existed.*

At a minimum, there is no clearly established law indicating these facts would be insufficient to support an arrest. Therefore, qualified immunity is appropriate on the second prong of the analysis as well.

### D. THE DISTRICT COURT ERRED IN FAILING TO GRANT QUALIFIED IMMUNITY ON LOBATO'S §1983 CONSPIRACY CLAIM.

Lobato next alleges the Detectives conspired to fabricate evidence against her and arrest her without probable cause.

MAC:14687-221 4875089_6.docx

### 1.  <u>Relevant conspiracy law.</u>

To establish a cause of action for conspiracy under §1983, a plaintiff must present facts sufficient to demonstrate: (1) the existence of an express or implied agreement among the defendant officers to deprive a person of his constitutional rights, and (2) an actual deprivation of those rights resulting from that agreement. *Ting v. United States*, 927 F.2d 1504, 1512 (9th Cir. 1991). One can infer an agreement from the defendant's acts pursuant to the conspiratorial scheme or from other circumstantial evidence. *Id.* at 1170. "Conspiracy is not an independent basis of liability in a § 1983 actions." *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008). Thus, the failure to prove a substantive constitutional injury precludes relief on a conspiracy claim. *Cefalu v. Village of Elk Grove*, 211 F.3d 416, 423 (7th Cir. 2000).

Similarly, in Nevada, "[a]n actionable civil conspiracy consists of a combination of two or more persons who, by some concert of action, intend to accomplish an unlawful objective for the purpose of harming another, and damage results from the acts." *Consolidated Generator-Nevada, Inc. v. Cummins Engine Co., Inc.*, 971 P.2d 1251, 1256 (Nev. 1988) (citations omitted).

MAC:14687-221 4875089_6.docx

## 2. Analysis of Lobato's civil conspiracy claim.

First, if this Court finds no fabrication of evidence occurred, this claim fails as a matter of law.

Second, the claim is barred by the intra-corporate conspiracy doctrine, which states that a conspiracy requires agreement between two or more persons or distinct business entities. *See Rabkin v. Dean*, 856 F.Supp. 543, 550-52 (N.D. Cal. 1994) (applying doctrine in §1985 case); *Hofmann v. City and Cty. of San Francisco*, 870 F.Supp.2d 799, 809 (N.D. Cal. 2012). The doctrine provides that, as a matter of law, an entity cannot conspire with its own employees or agents. This Court has not expressly addressed whether the doctrine applies either to government entities or to civil rights claims. District courts, however, have extended the doctrine to §1983 claims. *See Stuart v. City of Scottsdale*, 2021 WL 977166, *6 (D.Az. March 16, 2021) (Civil rights allegations "fall squarely within the intracorporate conspiracy doctrine" and "[w]here the individual defendants are all employees of the institutional defendant, a claim of conspiracy will not stand." (citations omitted)); *Hasbrouck v. Yavapai Cty.*, 2021 WL 321894, *15 (D. Az. Feb. 1, 2021) ("district courts [in the Ninth Circuit] that have addressed the issue consistently have held that it does apply"); *Ruble v. Escola*, 898 F.Supp.2d 956, 986 (N.D. Ohio 2012) (applying the doctrine to both federal law and Ohio state law conspiracy claims).

MAC:14687-221 4875089_6.docx

At a minimum, the Detectives enjoy qualified immunity on the issue because the law is not clearly established as to whether such a claim exists. *See Fazaga v. FBI*, 965 F.3d 1015, 1060 & n.41 (9th Cir. 2020) (qualified immunity barred claim because there is not clearly established Ninth Circuit law on whether "an intracorporate agreement could subject federal officials to liability under § 1985(3)").

E.    **THE DISTRICT COURT ERRED IN FAILING TO DISMISS LOBATO'S REMAINING STATE CLAW CLAIMS.**

Lobato's remaining state law claims for malicious prosecution, abuse of process, and IIED should be dismissed as well.

1.    <u>This Court has pendent jurisdiction over the state law claims.</u>

This Court has stated that in order for a ruling to fall under pendent appellate jurisdiction, "the legal theories on which the issues advance must either (a) be so intertwined that we must decide the pendent issue in order to review the claims properly raised on interlocutory appeal, or (b) resolution of the issue properly raised on interlocutory appeal necessarily resolves the pendent issue." *Meredith v. Oregon*, 321 F.3d 807, 813-14 (9th Cir. 2003); *Arc of California v. Douglas,* 757 F.3d 975, 993 (9th Cir. 2014) . In a situation where two legal standards overlap in part, the Court will exercise pendent jurisdiction where it "resolve[s] the primary appeal on the basis of that overlapping component of the analysis, in a manner that

MAC:14687-221 4875089_6.docx

resolves 'all of the remaining issues presented by the pendent appeal.'" *Arc of California*, 757 F.3d at 993 (quoting *Huskey v. City of San Jose*, 204 F.3d 893, 905 (9th Cir. 2000)).

> ## 2. <u>This Court should grant summary judgment on the state law claims.</u>

All of Lobato's state-law claims require findings similar to the §1983 claims.

### a. Malicious prosecution.

In Nevada, the elements of a malicious prosecution claim are: "(1) want of probable cause to initiate the prior criminal proceeding; (2) malice; (3) termination of the prior criminal proceedings; and (4) damage." *LaMantia v. Redisi*, 118 Nev. 27, 30, 38 P.3d 877 (2002). The standard for a state law claim is the same as federal law malicious prosecution claim. *See Lassiter v. City of Bremerton*, 556 F.3d 1049, 1054-55 (9th Cir. 2009). ("[P]robable cause is an absolute defense to malicious prosecution." *Id.* at 1054-55. Thus, if this Court has already concluded probable cause existed, this claim fails as a matter of a law.

### b. Abuse of process.

Abuse of process is a tort recognized to provide a remedy for cases in which legal procedure has been set in motion in proper form, with probable cause, but nevertheless has been perverted to accomplish an ulterior purpose for which it was not designed." *Rashid v. Albright*, 818 F. Supp. 1354, 1358 (D. Nev. 1993) (citing

Prosser & Keaton, LAW OF TORTS 896 (1984)). The essence of the tort of abuse of process is the use of the legal system to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do. *See Heck v. Humphrey*, 512 U.S. 477, 486 n.5 (1994). To successfully state a claim for abuse of process under Nevada law, a plaintiff must allege: (1) the defendant had an ulterior purpose in the underlying lawsuit other than resolving a legal dispute, and (2) the defendant willfully and improperly used the legal process to accomplish that purpose. *LaMantia*, 38 P.3d at 880. An action for abuse of process hinges on misuse of regularly issued process. *Dutt v. Kremp*, 844 P.2d 786, 790 (Nev. 1992) (internal citations omitted), *overruled on other grounds by LaMantia*; *Mirch v. Clifton*, 2015 WL 6681231, *5 (Nev. 2015) (citing *Nev. Credit Rating Bureau, Inc. v. Williams*, 88 Nev. 601, 606, 503 P.2d 9, 12 (1972)).

The Nevada Supreme Court has stated that an "ulterior purpose" includes any improper motive underlying the issuance of legal process. *Dutt*, 844 P.2d at 790. There is no liability when the defendant has done no more than carry out the process to its authorized conclusion, even if he or she does so with bad intentions. *See generally*, Prosser, LAW OF TORTS, §121, 857 (4th ed. 1971). Unless a plaintiff points to evidence that the officers were motivated by some collateral objective,

the existence of probable cause constitutes a defense to an action for abuse of process. *Shiels v. City of New York*, 141 A.D. 3d 421, 422, 35 N.Y.S. 3d 330 (1st Dept. 2016).

Here, there is no evidence the Detectives "were motivated by some collateral objective", and there is no evidence they misused their positions with bad intentions.

### c.    IIED.

The elements of an IIED claim are "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff having suffered severe or extreme emotional distress, and (3) actual or proximate causation." *Star v. Rabello*, 97 Nev. 124, 625 P.2d 90, 91-92 (1981).

Lobato's IIED claim is predicated upon her first establishing the Detectives violated her federal-law and/or state-law rights. There is no evidence of "extreme or outrageous" conduct on behalf of the Detectives as Lobato has failed to deliver any evidence the Detectives did anything wrong - let alone "extreme or outrageous."

MAC:14687-221 4875089_6.docx

# VIII. <u>CONCLUSION</u>

Based upon the above, the Detectives request that this Court reverse the district court and grant the Detectives' request for qualified immunity.

Dated this 21st day of February, 2023.

MARQUIS AURBACH

By */s/ Craig R. Anderson*
    Craig R. Anderson, Esq. (SBN 6882)
    10001 Park Run Drive
    Las Vegas, Nevada 89145
    *Attorneys for Defendants-Appellants, Las Vegas Metropolitan Police Department, Thomas Thowsen, and James LaRochelle*

MAC:14687-221 4875089_6.docx

## STATEMENT OF RELATED CASES

Defendants-Appellants Las Vegas Metropolitan Police Department, Thomas Thowsen, and James LaRochelle are not aware of any related cases before this Court, and it is believed that there are no related cases under Ninth Circuit Rule 28-2.6.

Dated this 21st day of February, 2023.

MARQUIS AURBACH

By /s/ Craig R. Anderson
    Craig R. Anderson, Esq.
    Nevada Bar No. 6882
    10001 Park Run Drive
    Las Vegas, Nevada 89145
    *Attorneys for Defendants-Appellants, Las Vegas Metropolitan Police Department, Thomas Thowsen, and James LaRochelle*

MAC:14687-221 4875089_6.docx

# CERTIFICATE OF COMPLIANCE

I certify that *(check appropriate option(s))*:

1.  ☒ *This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:*

    ☒ this brief contains <u>13,885</u> words (principal briefs must not exceed 14,000 words; reply briefs must not exceed 7,000 words) excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), or

    ☐ this brief uses a monospaced typeface (10.5 or fewer characters per inch) and contains _____ lines of text (principal briefs must not exceed 1,300 lines of text; reply briefs must not exceed 650 lines of text), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  *This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:*

    ☒ this brief has been prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman, 14-point font, or

    ☐ this brief has been prepared in a monospaced spaced typeface using Microsoft Word, _____ font with _____ characters per inch.

3.  *This brief complies with the enlargement of brief size permitted by:*

    ☐ Ninth Circuit Rule 28-4. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). This brief is _____ words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

    ☐ court order dated _____. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). This brief is _____ words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

MAC:14687-221 4875089_6.docx

☐ the accompanying motion for leave to file an oversize brief pursuant to Circuit Rule 32-2 and is _____ words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

☐ the accompanying motion for leave to file an oversize brief pursuant to Circuit Rule 29-2(c)(2) or (3) and is _____ words, _____ lines of text or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(a)(7)(B)(iii), if applicable.

4.  *Capital Cases:*

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Dated this 21st day of February, 2023.

MARQUIS AURBACH

By */s/ Craig R. Anderson*_____
Craig R. Anderson, Esq.
Nevada Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145
*Attorneys for Defendants-Appellants, Las Vegas Metropolitan Police Department, Thomas Thowsen, and James LaRochelle*

MAC:14687-221 4875089_6.docx

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **DEFENDANTS-APPELLANTS' OPENING BRIEF** with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on the 21st day of February, 2023.

☒ I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

☐ I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:


*/s/ Leah Dell*
An employee of Marquis Aurbach

MAC:14687-221 4875089_6.docx