# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

_____

KIRSTIN BLAISE LOBATO,

*Plaintiff-Appellee,*

v.

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT; THOMAS THOWSEN; AND
JAMES LAROCHELLE,

*Defendants-Appellants.*

_____

Appeal from the United States District Court
for the District of Nevada, Las Vegas
No. 2:19-CV-01273-RFB-EJY

_____

## ANSWERING BRIEF OF APPELLEE KIRSTIN BLAISE LOBATO

_____

David B. Owens
Megan Pierce
LOEVY & LOEVY
311 N. Aberdeen St.
Chicago, IL 60607
O: 312.243.5900
david@loevy.com
megan@loevy.com

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com

*Counsel for Plaintiff-Appellee Kirstin Blaise Lobato*

# CORPORATE DISCLOSURE STATEMENT

Plaintiff-Appellee Kirstin Blaise Lobato is an individual and has no corporate affiliation.

Plaintiff-Appellee Kirstin Blaise Lobato is represented in this Court by Elizabeth Wang, David B. Owens, and Megan Pierce, of Loevy & Loevy, and by the same counsel, along with Luke Busby of Luke Andrew Busby, Ltd., in the district court.

s/ Elizabeth Wang
Counsel of Record for Plaintiff-Appellee

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com
*Counsel of Record for Plaintiff-Appellee*

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................i

TABLE OF AUTHORITIES ...................................................v

INTRODUCTION...................................................................1

JURISDICTIONAL STATEMENT ..........................................3

STATEMENT OF ISSUES....................................................3

STATEMENT OF THE CASE ................................................4

I.   Facts Underlying Plaintiff's Claims ................................5

    A.   Lobato Survives a Sexual Assault around Memorial Day Weekend in May 2001..........................................5

    B.   Lobato Was in Panaca from July 2 to July 9, 2001 ...............7

    C.   Duran Bailey Was Murdered in Las Vegas on July 8, 2001 ..............................................................8

    D.   Defendants Were Assigned to Investigate the Murder ........10

    E.   Defendants Interviewed Laura Johnson .............................10

    F.   Defendants Knew the Incident Described by Lobato Was Not the Bailey Murder .................................12

    G.   Defendants' Investigation Was Designated to Generate Purported Inculpatory Evidence against Plaintiff and to Obscure or Attempt to Undermine a Wealth of Exculpatory Evidence ..........................................17

    H.   Defendants Fabricated Additional Evidence in their Reports .................................................................20

    I.     As a Result of Defendants' Conduct, Plaintiff Was Wrongfully Arrested, Prosecuted, Convicted, and Imprisoned ........................................................................25

II.   The District Court Concluded that There Is a Genuine Dispute of Material Fact Requiring a Trial...................28

SUMMARY OF ARGUMENT .................................................30

ARGUMENT ...........................................................................33

STANDARD OF REVIEW.......................................................33

I.    This Court Must Remand for Trial on Plaintiff's Fourteenth Amendment Claim .........................................34

    A.   This Court Lacks Jurisdiction to Review Defendants' Fact-Based Challenge to the District Court's Ruling...........34

    B.   A Reasonable Jury Could Find that Defendants Violated Plaintiff's Fourteenth Amendment Rights ..........................37

        1.   Direct Fabrication: Events that Never Happened or Words Never Said ......................................38

        2.   Direct Fabrication: Misrepresentations, Mischaracterizations, and Omissions that Portray the Evidence in a False or Misleading Light...............41

        3.   Evidence of Indirect or Circumstantial Fabrication ...47

    C.   The Law Was Clearly Established that an Officer Could Not Fabricate Evidence against a Criminal Defendant.......48

II.   A Reasonable Jury Could Find Defendants' Fabrication Caused the Violation of Plaintiff's Constitutional Rights............52

III.  This Court Must Remand for Trial on Plaintiff's Fourth Amendment Claim .........................................................62

A.  This Court Lacks Jurisdiction to Review Defendants' Fact-Based Challenge to the District Court's Ruling ........... 62

B.  Probable Cause Cannot Be Based on Fabricated Evidence ................................................................ 62

C.  Collateral Estoppel Does Not Apply ..................................... 65

D.  The Law Was Clearly Established that Officers Could Not Base Probable Cause on Fabricated Evidence ............. 67

IV.  This Court Must Remand for Trial on Plaintiff's Conspiracy Claim ........................................................................ 68

A.  This Court Lacks Jurisdiction to Review Defendants' Fact-Based Challenge to the District Court's Ruling ........... 68

B.  The Intracorporate Conspiracy Doctrine Does Not Apply ... 68

C.  The Law Was Clearly Established that Officers Could Not Conspire to Fabricate Evidence ..................................... 70

V.  There Is No Pendent Jurisdiction to Review the District Court's Denial of Summary Judgment on the State-Law Claims ........................................................................ 71

CONCLUSION ................................................................ 74

STATEMENT OF RELATED CASES ................................................. 75

CERTIFICATE OF COMPLIANCE ................................................... 76

CERTIFICATE OF SERVICE ....................................................... 77

# TABLE OF AUTHORITIES

## Cases

*Adams v. Speers*, 473 F.3d 989 (9th Cir. 2007) ...................................... 35

*Alcantara ex rel. Alcantara v. Wal-mart Stores, Inc.*,
321 P.3d 912 (Nev. 2014) .................................................................... 66

*Allen v. McCurry*, 449 U.S. 90 (1980) ..................................................... 65

*Alpha Energy Savers, Inc. v. Hansen*,
381 F.3d 917 (9th Cir. 2004) ....................................................... 36

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ........................... 37

*Atencio v. Arpaio*, 674 F. App'x 623 (9th Cir. 2016) .............................. 72

*Awabdy v. City of Adelanto*, 368 F.3d 1062 (9th Cir. 2004) ....... 58, 60, 67

*Bagley v. CMC Real Estate Corp.*,
923 F.2d 758 (9th Cir. 1991) ............................................................. 65

*Baldwin v. Placer Cnty.*, 418 F.3d 966 (9th Cir. 2005) ........................... 69

*Blankenhorn v. City of Orange*,
485 F.3d 463 (9th Cir. 2007) ....................................................... 32, 56

*Bull v. McCuskey*, 615 P.2d 957 (Nev. 1980) ......................................... 66

*Caldwell v. City & Cnty. of San Francisco*,
899 F.3d 1105 (9th Cir. 2018) .................................................... passim

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) .................................... 67

*Cameron v. Craig*, 713 F.3d 1012 (9th Cir. 2013) .................................. 69

*CarePartners, LLC v. Lashway*,
545 F.3d 867 (9th Cir. 2008) ............................................................. 33

*Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*,
626 F.3d 483 (9th Cir. 2010) ....................................................... 67, 68

*Coghlan v. Am. Seafoods Co. LLC.*,
413 F.3d 1090 (10th Cir. 2005) .......................................... 38

*Costanich v. Dep't of Social & Health Servs.*,
627 F.3d 1101 (9th Cir 2010) ..................................... passim

*Cousins v. Lockyer*, 568 F.3d 1063 (9th Cir. 2009) ............................... 71

*Crowe v. County of San Diego*, 608 F.3d 406 (9th Cir. 2010) ................ 56

*Cunningham v. City of Wenatchee*,
345 F.3d 802 (9th Cir. 2003) ............................................. 51

*Cunningham v. Gates*, 299 F.3d 1271 (9th Cir. 2000) ........................... 73

*Deorle v. Rutherford*, 272 F.3d 1272 (9th Cir. 2001) ....................... 31, 37

*Devereaux v. Abbey*, 263 F.3d 1070 (9th Cir. 2001) ..................... passim

*Dirks v. Martinez*, 414 F. App'x 961 (9th Cir. 2011) ............................. 69

*Dukes v. City of Albany*,
289 F. Supp. 3d 387 (N.D.N.Y. 2018) .......................... 65, 66

*Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009) ........................................ 53

*Estate of Anderson v. Marsh*, 985 F.3d 726 (9th Cir. 2021) ....... 33, 34, 35

*Evans v. Katalinic*, 445 F.3d 953 (7th Cir. 2006) ................................. 66

*Fagaza v. FBI*, 965 F.3d 1015 (9th Cir. 2020) ...................................... 71

*FBI v. Fagaza*, 142 S. Ct. 1051 (2022) ................................................ 71

*Franks v. Delaware*, 438 U.S. 154 (1978) ............................................ 68

*George v. Martin*, 736 F.3d 829 (9th Cir. 2013) ............................... 33, 35

*Gilbrook v. City of Westminster*,
177 F.3d 839 (9th Cir. 1999) ............................................. 69

*Gregory v. City of Louisville*,
444 F.3d 725 (6th Cir. 2006) ............................................. 57

*Gutierrez v. Kermon*, 722 F.3d 1003 (7th Cir. 2013)..........................35

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014)................................61

*Harris v. Roderick*, 126 F.3d 1189 (9th Cir. 1997) .............................69

*Holt v. Regional Trustee Servs. Corp.*,
   1266 P.3d 602 (Nev. 2011) ................................................66

*Hope v. Pelzer*, 536 U.S. 730 (2002)........................................49, 50

*Hopkins v. Bonvicino*, 573 F.3d 752 (9th Cir. 2009)..........................63

*Horvath v. Gladstone*, 637 P.2d 531 (Nev. 1981) ............................66

*In re Ozenne*, 841 F.3d 810 (9th Cir. 2016) ..................................34

*In re Sandoval*, 232 P.3d 422 (Nev. 2010) ...................................66

*In re Roundup Prod. Liab. Litig.*, 2022 WL 16646693
   (9th Cir. Nov. 3, 2022) ..................................................35

*Jackson v. City of Cleveland, et al.*,
   920 F.3d 340 (6th Cir. 2019)..............................................49

*Johnson v. Duffy*, 588 F.2d 740 (9th Cir. 1978)...............................56

*Johnson v. Jones*, 515 U.S. 304 (1995)....................................31, 34

*Jones v. Clark*, 630 F.3d 677 (7th Cir. 2011) .................................36

*Jordan v. State ex rel. Dep't of Motor Vehicles and Pub. Safety*,
   110 P.3d 30 (Nev. 2005) ..................................................67

*Kisela v. Hughes*, 138 S. Ct. 1148 (2018).....................................49

*Liberal v. Estrada*, 632 F.3d 1064 (9th Cir. 2011)..............................72

*Liston v. City of Riverside*, 120 F.3d 965....................................30, 51, 68

*Mantia v. Redisi*, 118 Nev. 27 (2002).........................................73

*Manuel v. City of Joliet*, 137 S. Ct. 911 (2017) ..........................62, 63, 73

*Maropulos v. County of Los Angeles*,
 560 F.3d 974 (9th Cir. 2009) .............................................. 35

*Mattos v. Agarano*, 661 F.3d 433 (9th Cir. 2011) .................................. 50

*McKenzie v. Lamb*, 738 F.2d 1005 (9th Cir. 1984) ................................. 63

*Mellen v. Winn*, 900 F.3d 1085 (9th Cir. 2018) ...................................... 38

*Migra v. Warrant City Sch. Dist.*, 465 U.S. 75 (1984) ........................... 65

*Miller v. Pate*, 368 U.S. 1 (1967)…………………………………….59

*Mills v. Covina*, 921 F.3d 1161 (9th Cir. 2019) ..................................... 65

*Miranda v. Arizona*, 384 U.S. 436 (1966) .......................................... 12

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ...................................... 34, 35

*Monell v. Dep't of Soc. Servs. of City of New York*,
 436 U.S. 658 (1978) .............................................................. 70

*Mooney v. Holohan*, 294 U.S. 103 (1935)………………………………58, 59

*Monroe v. Pape*, 365 U.S. 167 (1961) ............................................ 32, 55

*Napue v. Illinois*, 360 U.S. 264 (1959)……………………………………59

*O'Connell v. Alejo*, 2020 WL 1244852
 (D. Colo. Mar. 16, 2020) ........................................................ 66

*Ornellas v. Oakley*, 618 F.2d 1351 (9th Cir. 1980) ........................... 65, 66

*Ortiz v. Jordan*, 562 U.S. 180 (2011)......................................................... 34

*Pac. Shores Properties, LLC v. City of Newport Beach*,
 720 F.3d 1142 (9th Cir. 2012) ................................................... 53

*Peterson v. Heymes*, 931 F.3d 546 (6th Cir. 2019) ............................... 66

*Pierson v. Ray*, 386 U.S. 547 (1967)........................................................ 49

*Plumhoff v. Rickard*, 572 U.S. 765 (2014).............................................. 35

*Pyle v. Kansas*, 317 U.S. 213 (1942) ..................................... 51

*Richards v. Cnty. of San Bernardino*,
39 F.4th 562 (9th Cir. 2022) ............................... 51, 52, 53, 59

*Rodarte v. Gutierrez*, 2023 WL 109723
(9th Cir. Jan. 5, 2023) ................................................. 51, 60

*Rogers v. Jarrett*, __F.4th__, 2023 WL 2706752
(5th Cir. Mar. 30, 2023) ...................................................... 49

*Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927 (9th Cir. 2017) ......... 52, 53

*Scafidi v. LVMPD*, 966 F.3d 960 (9th Cir. 2020) ...................... 62, 63, 66

*Scott v. Harris*, 550 U.S. 272, 380 (2007) .................................... 34

*Smiddy v. Varney*, 665 F.2d 261 (9th Cir. 1981) ................................. 68

*Spencer v. Peters*, 857 F.3d 789 (9th Cir. 2017) ........................... passim

*Stinson v. Gauger*, 868 F.3d 516 (7th Cir. 2015) ................................ 35

*Stoot v. City of Everett*, 582 F.3d 910 (9th Cir. 2009) ............... 32, 54, 55

*Swint v. Chambers Cty. Comm'n*, 514 U.S. 35 (1995) ........................... 72

*Taylor v. Riojas*, 141 S. Ct. 52 (2020) ........................................ 50

*Torres v. City of Los Angeles*, 548 F.3d 1197 (9th Cir. 2008) .......... 64, 65

*United States v. Lanier*, 520 U.S. 259 (1997) ................................. 50

*United States v. Oakland Cannabis Buyers' Coop.*,
190 F.3d 1109 (9th Cir. 1999) ............................................... 73

*United States v. Stanert*, 762 F.2d 775 (9th Cir. 1985) ................... 30, 68

*Washington v. Duty Free Shoppers*, 696 F. Supp. 1323
(N.D. Cal. 1988) ............................................................ 69

*White v. Pauly*, 580 U.S. 73 (2017) ........................................... 49

ix

*Wige v. City of Los Angeles*, 713 F.3d 1183 (9th Cir. 2013) ................... 67

*Woods v. City of Reno*, 2018 WL 493015 (D. Nev. Jan. 18, 2018) .......... 66

*Zadeh v. Robinson*, 928 F.3d 457 (5th Cir. 2019) ................................... 49

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ............................... 50, 69, 70, 71

## Statutes

28 U.S.C. § 1291 ......................................................................... 34

28 U.S.C. § 1331 ........................................................................... 3

42 U.S.C. § 1983 ......................................................................... 49

## Other Authorities

William Baude, *Is Qualified Immunity Unlawful?*,
106 Cal. L. Rev. 45 (2018) ....................................................... 49

Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*,
111 Cal. L. R. 201 (2023) ......................................................... 49

Joanna C. Schwartz, *The Case Against Qualified Immunity*,
93 Notre Dame L. Rev. 1797 (2018) ....................................... 49

Ninth Circuit Jury Instr. § 9.33……………………………………………57

Wright & Miller, Fed. Prac. & Proc. §§ 4427, 4432, 4433 ...................... 66

# INTRODUCTION

Plaintiff Kirstin Blaise Lobato was just a teenager when she survived a sexual assault and defended herself against a still-unknown assailant. In staving off the attack, she had acted entirely in self-defense, escaped, and fortunately was not raped or worse. Rather than recognizing that Lobato was a teenage crime victim or expressing concern for the trauma she suffered, Defendants re-victimized her by accusing her of committing the heinous murder of Duran Bailey, which she had nothing to do with.

The entire notion that Lobato killed Bailey came from the police, not from any objective evidence. No forensic evidence linked Lobato to the crime. No eyewitness claimed to see Lobato kill Bailey. It was the police—the Defendants in this suit—who generated the idea that Lobato was a heinous murderer responsible for killing Bailey. They knew better but sought Lobato's wrongful conviction anyway. Defendants succeeded: though Lobato was innocent, she spent nearly 17 years imprisoned until the presentation of additional scientific evidence conclusively proved she could not have murdered Bailey.

This Court lacks jurisdiction over this appeal. Though Defendants pay lip-service to the prohibition on making fact-based challenges, their appeal turns on challenging Plaintiff's facts. Defendants stray far from issues collateral to the merits of the suit. There is no question the Constitution prohibited Defendants from fabricating evidence against Lobato—Defendants simply deny that they did. A jury must hear that argument in the first instance, not a court.

Defendants' challenges also misconstrue Plaintiff's fabrication theories. Plaintiff contends, and a reasonable jury could find, Defendants fabricated evidence to make it appear that Lobato, who survived a sexual assault on the east side of Las Vegas in May 2001, committed a gruesome murder and postmortem mutilation in July 2001 on the west side of Las Vegas. Because the cornerstone of the evidence in the criminal prosecution was built on Defendants' fabrications, summary judgment was properly denied. In this case, there is no issue of qualified immunity unrelated to Defendants' fact-bound challenges. The appeal should be dismissed or, in the alternative, the district court's decision should be affirmed.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over Plaintiff's federal claims under 28 U.S.C. § 1331. On September 1, 2022, the district court denied Defendants-Appellants Thomas Thowsen and James LaRochelle's motion for summary judgment. 1-ER-2-30.[1] Defendants timely filed their notice of interlocutory appeal on September 19, 2022. 21-ER-4973. However, as explained below, this Court lacks appellate jurisdiction over this appeal.

# STATEMENT OF ISSUES

1.    Whether this Court lacks jurisdiction to consider Defendants' interlocutory appeal of an order denying qualified immunity at summary judgment when Defendants' arguments rest on disputed facts.

2.    Assuming *arguendo* jurisdiction, whether the district court correctly determined that a reasonable jury could find that Defendants fabricated evidence against Plaintiff in violation of her rights under the Fourteenth and Fourth Amendments.

---

[1] Defendant LVMPD did not file a motion for summary judgment.

3.     Assuming *arguendo* jurisdiction, and because it was clearly established in 2001 that a police officer could not fabricate evidence against a criminal defendant under the Fourteenth and Fourth Amendments, whether there is any question of law to decide.

4.     Assuming *arguendo* jurisdiction, whether the district court correctly determined that a reasonable jury could find Defendants caused Plaintiff harm.

5.     Whether there is a basis for this Court to exercise pendent appellate jurisdiction over the district court's denial of summary judgment on the state-law claims where those claims are not "inextricably intertwined" with any issue over which the Court has jurisdiction.

## STATEMENT OF THE CASE

Defendants have construed facts in their own favor; ignored material facts that run contrary to their self-serving spin; included irrelevant facts; and relied upon scores of facts that are genuinely disputed. Plaintiff's facts (and those found by the district court), which must be credited, follow.

## I. Facts Underlying Plaintiff's Claims

### A. Lobato Survives a Sexual Assault around Memorial Day Weekend in May 2001

In 2001, Kirstin Blaise Lobato was 18 years old. She was 5'6" and weighed about 100 pounds. 11-ER-2452. She grew up in Panaca, Nevada, a small town about 165 miles and a 3-hour drive from Las Vegas. 11-ER-2448. As a child, Lobato had been the victim of multiple sexual assaults. When she reported those incidents to the police, they did nothing to investigate. This made her wary of calling the police for help. 11-ER-2458; 17-ER-3720-23.

In May 2001, Lobato was living with a friend on the east side of Las Vegas, at the Budget Suites Inn at Boulder Highway and Nellis. 11-ER-2448. At some point around Memorial Day, Lobato drove back to the Budget Suites after a night out. 11-ER-2450-51. She got out of her car in the open parking lot and began walking back to her room when a man attacked her from behind and knocked her to the ground. 11-ER-2452. The attacker was a very large Black man over 6' tall and more than 200 pounds. He had his penis exposed, got on top of Lobato, and tried to rape her. 11-ER-2452-53. As Lobato was crying, the attacker slapped her, told her to shut up, and called her a bitch. 11-ER-2506.

Lobato struggled and pulled out a small knife that she carried in her pocket for protection. She grabbed for whatever she could reach and made a cutting or stabbing motion one time. 17-ER-3702-03; 11-ER-2453. She did not cut anything off, did not slice off the attacker's penis, and did not throw anything. 11-ER-2453-54; 17-ER-3703-04. This was enough to deter her attacker; he fell backward, and Lobato was able to escape in her car. 11-ER-2454. The entire incident lasted less than five minutes. 11-ER-2452. When Lobato left, her attacker was still alive; he was on his knees, holding his midsection and crying. 11-ER-2454; 17-ER-3704.

Afraid that her attacker might come after her, Lobato drove to the house of her ex-boyfriend, Jeremy Davis, who lived less than a mile away. 11-ER-2454-56. After dropping off her car and leaving Davis a note, she went to a church around the corner. 11-ER-2456-58. Lobato used a phone at the church to call friends, who came to pick her up. 11-ER-2457-58.

As with many survivors of sexual assault, Lobato did not call the police to report the incident because, in her experience, they would not help. 11-ER-2458. At the same time, Lobato told a few people about

what happened because she was proud of being able to defend herself and escape the attack. *Id.*

Following the attack, Lobato spent the next few weeks in Las Vegas with Steve Pyszkowski and Cathy Reininger. 11-ER-2459; 17-ER-3718. About a week after the Memorial Day weekend attack, Lobato and Pyszkowski picked up her car from Davis's house in early June. 17-ER-3709; 11-ER-2556.

At the end of June 2001, Lobato went to stay with a friend, Doug Twining, at his parents' home in Las Vegas, for a few days. 20-ER-4772.

## B.   Lobato Was in Panaca from July 2 to July 9, 2001

Lobato left Las Vegas and returned to Panaca on July 2, 2001. 11-ER-2465. Lobato remained in Panaca from July 2 to July 9. 17-ER-3692. During that time, Lobato's car was parked on the street in front of her parents' home. 8-ER-1696; 11-ER-2465. On July 4, Lobato was at a barbecue at her parents' house. 9-ER-2093. On July 5, Lobato visited a doctor in Panaca. 19-ER-4196-4206. On July 5, 6, and 7, Lobato spent time with a friend, Chris Carrington, and visited her dad at work. 8-ER-1783; 10-ER-2232. After that, Lobato's stepmother picked her up, and

they were together until her stepmother went to sleep around midnight. 10-ER-2276.

Throughout the afternoon on July 8, Lobato rode four wheelers with friends on her parents' street in Panaca. 2-ER-199, 217-22. Around 3:00 or 4:00 p.m. that day, Lobato hung out in the family garage with Carrington. 8-ER-1779; 10-ER-2217. At around 6:30 p.m., Lobato's cousin stopped by. Lobato remained at her parent's house the entire evening of July 8 through the early morning of July 9. 9-ER-2094, 2101; 10-ER-2218. She could not have committed the Bailey murder, which took place the evening of July 8. 11-ER-2465; 17-ER-3725-26.

In the early morning hours of July 9, 2001, Twining came to pick up Lobato from her parents' house. 10-ER-2218, 2313-16; 11-ER-2470. This was corroborated by phone records in Defendants' possession showing calls from Twining's cell phone to the landline at Lobato's parents' house on July 8 and 9. 10-ER-2262, 2313-16; 2-ER-268-77; 11-ER-2406; 7-ER-1466; 20-ER-4765.

## C. Duran Bailey Was Murdered in Las Vegas on July 8, 2001

On the evening of July 8, 2001, an individual searching through a dumpster found a dead body, partially wrapped with plastic, in a trash

dumpster enclosure in the area of 4240 West Flamingo Road in Las Vegas. 1-ER-3; 12-ER-2813. The body was covered with garbage bags and loose trash, and there were cigarette butts found in the plastic wrapped around the body. 1-ER-3; 11-ER-2389; 6-ER-375. Police later identified the body as that of Duran Bailey, a homeless man. 1-ER-3. Bailey had been brutally attacked. He had suffered multiple stab wounds, a fractured skull and rib, missing teeth, and defensive wounds as well as a severed penis and lacerations to his anus and scrotum. The cause of death was blunt force trauma to the head and stab wound to the neck. 1-ER-3; 11-ER-2369-78. The injuries to Bailey's genitalia were inflicted postmortem. *Id.* At the time of his death, Bailey was 5'10" and weighed 133 pounds. 2-ER-292.

Bailey was killed on July 8, 2001, after sunset, at about 8:00 or 9:00 p.m. 4-ER-709-10, 773-74; 5-ER-914-17, 973, 1001-02. 911 was called at 10:36 p.m. by the person who discovered Bailey's body. 20-ER-4585.

There was a lot of blood spatter and blood in the trash enclosure. 11-ER-2390. There were bloody shoeprints left by the killer which did

not match Lobato's shoes. 11-ER-2389; 3-ER-313-14, 320-25, 352-54, 373-76, 391-93; 20-ER-4616, 4623.

### D.     Defendants Were Assigned to Investigate the Murder

Defendants Thowsen and LaRochelle were assigned to investigate the murder. 1-ER-3. They arrived at the scene sometime after 12:48 a.m. on July 9, 2001. 11-ER-2387. When they arrived, some of the blood was still wet. 20-ER-4585. They spent about six hours at the crime scene and were briefed on all information learned by other investigators. They also made decisions about collection, preservation, and testing of evidence. 20-ER-4613, 4615; 3-ER-324-25, 358, 476, 514; 6-ER-1143-44, 1151-52. Not only were Defendants aware of the condition of the crime scene, but they were present for Bailey's autopsy and knew the nature and extent of his injuries. 3-ER-524; 20-ER-4612-13, 4618, 4623-24.

### E.     Defendants Interviewed Laura Johnson

Between July 9-20, 2001, Defendants took few steps to investigate Bailey's murder. They had no viable leads. 11-ER-2394; 20-ER-4582, 4622, 4625-26; 3-ER-534-35. On July 20, 2001, Defendants received a call from Laura Johnson, a juvenile probation officer in Lincoln County,

Nevada. 1-ER-3. She told them that a friend of hers, Dixie Tienken, a teacher, had reported to her that one of her former students (Lobato) had cut the penis of a man who tried to rape her. *Id.* Johnson said nothing about Lobato being involved in a murder or anything like the brutal attack on Bailey.

Defendants went to Johnson's house and interviewed her. Part of the interview was recorded, and part of it was not. 1-ER-3; 20-ER-4627. LaRochelle took contemporaneous notes of what was said during the unrecorded portion of the interview but later destroyed his notes. 1-ER-3-4; 3-ER-517-18; 4-ER-580-82; 20-ER-4602. Defendants admit that the information provided by Johnson did not show a connection between Lobato and the murder, and there was no probable cause to arrest Lobato based on the information provided by Johnson. 3-ER-548, 551-54, 556-57.

Defendants searched Lobato's criminal history and learned she had no criminal record. They also learned she was the victim of sexual assault at the age of six. 1-ER-4; 20-ER-4627.

## F.  Defendants Knew the Incident Described by Lobato Was Not the Bailey Murder

That same day, Defendants went to interview Lobato at her parents' house in Panaca. 1-ER-4. Lobato's parents were not home when the detectives arrived. *Id.* She agreed to speak with Defendants and signed a *Miranda*[2] card. She spoke to the Defendants for about fifteen to twenty minutes before the detectives turned on the tape recorder. *Id.* LaRochelle took meticulous notes of what was said during the unrecorded portion of the interview but destroyed the notes. 1-ER-4; 3-ER-538-39; 4-ER-580; 20-ER-4633.

Defendants wanted to interview Lobato before her parents came home. 20-ER-4599, 4642. Defendants introduced themselves to Lobato as homicide detectives from the LVMPD and told her they knew she had been attacked in Las Vegas. 11-ER-2501. They also told her that they knew she had been sexually assaulted as a child, causing her to become upset and cry. 11-ER-2475, 2490, 2501. Defendants knew that, in order to obtain reliable and voluntary information from Lobato, it was important that Lobato knew what event they were asking her

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

about. *See* 3-ER-427-28. Despite this, Defendants refused to orient Lobato to what homicide they were investigating. 11-ER-2501; 20-ER-4637; 4-ER-681.

Defendants also knew the importance of seeking and memorializing key information—namely the "who," "what," "when," "where," and "why" of the crime—from the suspect during an interrogation, but they refused to do so. 20-ER-4599; 3-ER-565-70, 573-75; 2-ER-250. They knew it was important to obtain as much information as possible during an interrogation before arresting a suspect and to ask follow-up questions. 3-ER-557. They also knew that if a suspect told them information about a crime that is inconsistent with what they knew about the crime scene, it is more likely the suspect is not involved. 3-ER-441-42.

Because Defendants purposefully misled Lobato about their investigation, Lobato believed they were asking her about the sexual assault at the Budget Suites around Memorial Day. 11-ER-2475, 2477; 6-ER-1187-88. Lobato did not understand that Defendants were asking her about a brutal murder that took place on July 8, 2001—over a month after she was attacked—and of which she had no knowledge. 11-

ER-2477. She did not understand that she had been arrested for the murder until she saw a newspaper. 11-ER-2481.

During the fifteen to twenty minutes Defendants talked to her before they turned on the tape recorder, Lobato told them that she had been attacked at a Budget Suites on the east side of town around Memorial Day. 17-ER-3695, 3698-99.

During the recorded portion of the interview, Lobato stated the following: "Over a month" prior, she was at a Budget Suites motel on the east side of town. 11-ER-2477, 2526. The motel was located near "Boulder Highway and Nellis," "close to Sam's Town." 11-ER-2502, 2519. Lobato had parked her car, a red Pontiac, in the parking lot of the Budget Suites. 11-ER-2501, 2506. While Lobato was in the parking lot, a "really big," older Black male who was "very smelly" and "seemed like a giant," approached her, threw her down, and attempted to rape her. 11-ER-2503-04. Lobato described the attack occurring in an open parking lot with a fountain and a shopping center across the street. 11-ER-2519. Lobato told the officers she took a knife from her rear pocket, grabbed for whatever she could, and cut the man's penis or whatever

14

she could "grab" once during the struggle. 11-ER-2505, 2522. Lobato told Defendants she was wearing high-heeled shoes. 11-ER-2524.

Lobato told Defendants that she fled her attacker. When she left, the man was alive, crying. 11-ER-3506; 3-ER-620. Lobato did not move him, cover him with trash, or wrap him in plastic. Nor did she describe stabbing him multiple times, fracturing his skull or ribs, or mutilating his genitals postmortem. 11-ER-2506-07, 2521-22; 4-ER-627-30. Lobato then left her car at her ex-boyfriend Jeremy Davis's house for about a week. 11-ER-2507. She told Defendants that she went to a church near his house afterwards. 11-ER-2509.

Lobato never told Defendants that the attack she experienced happened "a couple weeks ago"; instead, Thowsen suggested this. 20-ER-4637; 17-ER-3695-96. Also at Defendants' suggestion, Lobato admitted to possessing a baseball bat in the backseat of her car. 11-ER-2520. They also suggested there was a dumpster in the area, which she denied. 11-ER-2515. Knowing that Bailey's killer had hit a median near the trash enclosure, Defendants asked Lobato if she hit anything with her car, which she denied. 11-ER-2519.

Defendants knew that the attack Lobato survived and the events surrounding it was not the Bailey murder, given how different the facts of the two events were. The dates were different: where Lobato was attacked around Memorial Day, Bailey was killed on July 8. After the attack, Lobato had left her car at Davis's house, and Defendants *knew* this was a major difference that was not related to Bailey, because they themselves wrote in their report that it "had actually happened the month previously." 11-ER-2399.

The locations were different: whereas the attack Lobato described took place at a hotel parking lot with a fountain on the east side of town, Defendants knew that the Bailey murder took place on the west side of town in a dumpster enclosure outside of a bank. 3-ER-506-09; 20-ER-4614; 9-ER-1993.[3]

The people were different: whereas Lobato described her attacker as a "giant," Bailey was slight. 2-ER-292. When Defendants showed Lobato a photo of Bailey, she did not recognize him. 11-ER-2495-96.

---

[3] Asserting their version of the facts, Defendants argue that Lobato was confused about the location of the May 2001 attack. This is not what she said. She said she could be mistaken about the location of where she had met people to *dance*. 11-ER-2513-14; 17-ER-3710. Lobato also drew on the table with her fingers the location of the attack. 17-ER-3711-12.

Whereas Lobato described possibly cutting her attacker one time and then escaping while he was still alive, Defendants knew that Bailey had been stabbed multiple times, had numerous defensive wounds, was covered in plastic, had been moved, and was mutilated postmortem. 3-ER-315; 20-ER-4613; 4-ER-638-39; 11-ER-2389-90.

Defendants' conduct during the interview also confirms they knew Lobato was describing something else. In addition to engaging in guilt-presumptive questioning, 6-ER-1182, 1188-90, Defendants attempted to make Lobato feel as though she should not trust her own recollection. 11-ER-2497.

After the interview, Defendants arrested Lobato for the murder. 1-ER-4.

### G. Defendants' Investigation Was Designated to Generate Purported Inculpatory Evidence against Plaintiff and to Obscure or Attempt to Undermine a Wealth of Exculpatory Evidence

Defendants refused to seek testing of significant pieces of evidence, including: most of the evidence collected with the sexual assault kit conducted on Bailey, three cigarette butts found *under* the plastic wrapped around Bailey's abdomen; and various other pieces of evidence. 3-ER-378-408, 510-12; 6-ER-1364-65, 1367-70, 1372-76, 1380.

Defendants were responsible for requesting that such evidence be tested, knew it was important to test it, and knew that, absent their request, the evidence would not be tested. 4-ER-656, 658-59; 3-ER-366-67; 6-ER-1152-53, 1168-69.

Lobato gave Defendants the shoes she was wearing on the night she was attacked. Those shoes did not have Bailey's blood on them and did not match the bloody shoeprints left at the scene. Lobato's shoe size was much smaller than the killer's shoeprints. 11-ER-2396; 3-ER-391-92; 3-ER-502. No blood was found in Lobato's car or the baseball bat in her car. 3-ER-385-86; 6-ER-1361-62; 4-ER-608. Defendants knew that no physical evidence or eyewitnesses connected Lobato to the crime. 11-ER-4595; 3-ER-378-81, 385-92, 404-08.

Defendants knew that there were fresh black tire marks on the curb of the landscaped median at the bank, which they believed were left by the killer, that were not from Lobato's car. 20-ER-4616.

When Defendants interviewed Davis, he confirmed that Lobato left her car at his house between May 25-28, 2001. 12-ER-2645-46; 4-ER-684. Pyszkowski told Defendants that he helped retrieve Lobato's car from Davis's house, and he produced a receipt showing this

happened on June 6, 2001. 11-ER-2399, 2556. Pyszkowski paid the tow truck driver to stop the car from being towed on June 6, 2001. 11-ER-2576. He obtained a receipt. *Id.* He told Defendants that the car had been there "maybe five days," "around the first of … June." 11-ER-2556. Despite all of this consistent information showing Lobato's attack was unrelated to the Bailey murder, Defendants claimed Lobato's interview constituted a "confession" to the Bailey murder.[4]

Defendants also knew that multiple witnesses confirmed that Lobato was in Panaca at the time of the attack and that Lobato told them about the attack *before* Bailey's murder occurred. 20-ER-4590, 4753, 4766; 12-ER-2606-13, 2693; 11-ER-2406, 2565, 2592; 7-ER-1466-67. When Twining provided Defendants proof that Lobato was in Panaca at the time of the murder, Defendants told him to mind his own business or he would end up in jail like Lobato. 20-ER-4757-58.

---

[4] Defendants argue the differences between Lobato's statement that the attack took place "over a month" before the July 20 interview does not place the timing closer to May than to Bailey's murder. Not only does this factual dispute confirm the lack of jurisdiction, but Defendants' own reports undermine this argument. They wrote that Lobato dropped off her car at Davis's house (after the attack) "the month previously" to the Bailey homicide.

Just as Defendants did not record the entirety of their interrogation of Lobato (and discarded notes), Defendants selectively recorded their interviews with witnesses to exclude exculpatory information and include only the information they wanted; they also fed witnesses answers and influenced their statements. 7-ER-1466-67; 20-ER-4602, 4627-28, 4743, 4752-54, 4769, 4778; 21-ER-4821-23, 4829.

## H.  Defendants Fabricated Additional Evidence in their Reports

Despite the stark differences between the attack Lobato described and the Bailey murder, Defendants wrote reports falsely portraying and labeling Lobato's statements about the May attack at the Budget Suites as a confession to the Bailey murder on July 8. That itself was an act of fabrication *writ large*.

More specifically, the fabricated reports included (1) the Arrest Report, which purported to detail the circumstances under which Defendants arrested Lobato, and (2) the Officer's Report, which purported to detail the actions Defendants took to investigate the Bailey murder and the evidence they obtained.

Both reports include information Lobato never said. For example, Defendants falsely wrote that, after Lobato was arrested and booked at

the jail, Lobato said that the jail cell enclosure reminded her of the location in which she had been attacked. 11-ER-2397; 21-ER-4838. Lobato never said this. 11-ER-2476, 2482. LaRochelle took notes of Defendants' conversation with Lobato but destroyed those notes. 4-ER-632.

The Arrest Report's affirmative falsehoods included the following:

- Lobato was "unsure" where the attack occurred. 21-ER-4838. Lobato was specific and clear about where the attack occurred: in the parking lot of the Budget Suites at Boulder Highway and Nellis, with a fountain nearby and shopping center across the street. 11-ER-2502, 2519.

- Lobato "thought that she had severed the penis from the male's body" and she "last saw the male lying on the ground." 21-ER-4838. This was not what she said. Lobato told Defendants that she "cut his penis" during the attack but she did not know if she cut it off. 11-ER-2505. He was still alive and kneeling, 11-ER-2406, 2454.

- Lobato "hid her car at her ex-boyfriend's house." 21-ER-4838. Lobato did not say this. She said she "ditch[ed]" her car at Davis's house, which was parked in plain sight. 11-ER-2507.

- "[O]n Friday, July 13th, [Lobato] returned to Panaca sometime after the incident," 21-ER-4838, implying that she left las Vegas because of Bailey's murder. This was not what Lobato said. Lobato told Defendants she returned to Panaca on July 13th to get away from the partying and drug culture in Las Vegas. 11-ER-2514. Nothing about this date referred to an "incident" (let alone a murder) at all.

The Arrest Report also omitted material facts, to make it seem as if Lobato was describing Bailey, when she was not. Those include that Lobato's attacker was "giant" and heavy, while Bailey was very skinny, and that the person who attacked Lobato was alive. The Report omitted that Lobato gave a detailed description of where the attack occurred, which contradicted the scene of Bailey's murder, and the timing of the events. *Compare* 21-ER-4837-38 *with* 11-ER-2504, 2506, 2519, 2526; 17-ER-3711-13.

The Officer's Report contained the following affirmative falsehoods:

- Lobato told them she "grabbed his penis and testicles with her left hand and 'cut it off' with her right hand." 11-ER-2396. She never said this. 11-ER-2505.

- Lobato told them, "at that point she 'snapped' and cannot remember what else happened." 11-ER-2396. Lobato never said this or that she "completely lost it." 6-ER-1356. LaRochelle agreed that she did not say she "snapped" or "completely lost it" or "cut it off" during the recorded interview. 4-ER-579, 616-19.

- Defendants showed Lobato a photograph of Bailey. Defendants wrote, "Lobato looked at the photograph, and her eyes began to tear. Lobato said that she could not recognize him [referring to the photograph], and that she had put him [Duran Bailey] out of my mind." 11-ER-2396 (brackets in original). Defendants knew that Lobato was not referring to Bailey, but to her attacker in the May incident.

The implication Defendants created with these falsehoods and omissions is that Lobato killed Bailey, cut off his penis, and then "lost it" and could not remember anything else she did afterwards. None of this was true, and Defendants knew it.

The Officer's Report included numerous intentionally misleading passages, such as:

- The Officer Report mischaracterized McBride as being unsure of the date that Lobato told her about the Budget Suites attack, 11-ER-2402, when McBride said it was July 5 or 6. 12-ER-2693.

- Defendants wrote that Pyszkowski said Lobato left his house near the Fourth of July and stayed with Twining for four to ten days. 11-ER-2399. But this is not what Pyszkowski said. Defendants intended to suggest that Lobato was staying with Twining at the time of the murder when they knew she was not. 11-ER-2558.

- Defendants wrote, "Lobato said she went back to Panaca on July 13th and contacted a doctor and was prescribed Prozac due to her depression from the incident." 11-ER-2396. This was not what Lobato said. She said she went to Panaca on July 13th in order to "get clean." 11-ER-2514. Defendants intentionally included this misleading statement to falsely suggest that Lobato returned home on July 13 after killing Bailey because she was depressed.

The Officer's Report also made material omissions, including: Lobato's clear description of the location on the east side of town, never

mentioning the street "Flamingo" (where Bailey's murder occurred); Lobato's description of the attacker as a "giant"; Lobato did not hit, move, or cover her attacker: Lobato's statement that the attack occurred "over a month" ago; the attacker was alive and crying. 11-ER-2395-96.

## I.     As a Result of Defendants' Conduct, Plaintiff Was Wrongfully Arrested, Prosecuted, Convicted, and Imprisoned

Defendants knew that their Arrest Report and Officer's Report would be given to the prosecutor. 20-ER-4603; 4-ER-588. Defendants' reports and the rest of the homicide file were provided to prosecutors, who used them to assess probable cause and prosecute the case. 21-ER-4833. Defendants' homicide file also included their selectively recorded interviews.

On August 7, 2001, a preliminary hearing was held. Thowsen testified and made many of the same false statements and material omissions as in the reports. 7-ER-1438-45, 1453. As a result, the presiding judge found probable cause. 1-ER-4; 7-ER-1456. Lobato was detained pending trial. 1-ER-4.

Lobato's first criminal trial occurred in May 2002. At trial, Lobato's defense was that at the time of Bailey's murder on July 8, she was not in Las Vegas, but was in Panaca. 1-ER-4. However, witnesses

were not allowed to testify that Lobato had told them about the attack before Bailey's death, and fabricated statements were introduced at trial. 11-ER-2486. On May 18, 2002, the jury found Lobato guilty of first-degree murder with use of a deadly weapon and sexual penetration of a dead human body. The conviction was reversed on direct appeal. 1-ER-4.

In 2006, Lobato was retried and convicted again. Fabricated evidence was again introduced. Thowsen testified about the Officer's Report in court, including the claim that Lobato said the holding cell area looked like where the attack occurred. 9-ER-1988. The selectively recorded statement of Lobato was also introduced through Thowsen at trial. 9-ER-1973. Witnesses were not allowed to testify that Lobato told them about the Budget Suites attack before Bailey's death. 7-ER-1468; 11-ER-2488.

Lobato was sentenced to thirteen to thirty-five years' imprisonment. As a result of Defendants' misconduct, Lobato spent almost 17 years wrongfully imprisoned, where she faced constant stress and physical and emotional pain. 11-ER-2492-93.

In 2011, Lobato filed a new appeal. In 2016, the Nevada Supreme Court remanded the case for further proceedings. 1-ER-5.

In October 2017, an evidentiary hearing on post-conviction relief was held. 1-ER-5. In December 2017, the court held that trial counsel was ineffective for failing to meaningfully consult a forensic pathologist and forensic entomologist regarding Bailey's time of death, because time of death was a crucial aspect of establishing Lobato's defense that she was in Panaca at the time of the crime. The evidence showed that on July 8, 2001, Lobato was in Panaca from 11:30 a.m. until the end of the night, and she returned to Las Vegas only the next afternoon. Various witnesses testified that they saw Lobato in Panaca throughout the day on July 8. The State argued that Lobato killed Bailey in the early morning hours of July 8, before she left for Panaca. Because the expert testimony showed that Bailey likely was killed after sunset on July 8, Lobato could not have killed Bailey, because her uncontested evidence placed her in Panaca at the time of death. 1-ER-5; 5-ER-915-17, 973, 1001-02, 1076-78; 4-ER-773-74. The court granted post-conviction relief and ordered a new trial. 19-ER-4207-62.

On December 29, 2017, the court dismissed the charges against

Lobato. 20-ER-4489-91.

## II. The District Court Concluded that There Is a Genuine Dispute of Material Fact Requiring a Trial

Plaintiff filed this civil rights action in 2019. After discovery,

Defendants filed for summary judgment. In a detailed and well-

reasoned opinion, the district court found:

> there are genuine disputes of material fact regarding whether Defendants Thowsen and LaRochelle deliberately fabricated evidence against Plaintiff. … a reasonable jury could find based upon several different pieces of circumstantial evidence in the record that Defendants deliberately mischaracterized Plaintiff's statements and omitted certain important information in their investigative reports, thereby constructing a theory of the case that painted Plaintiff as having clearly admitted to the crime, when she only admitted to cutting someone in an earlier unrelated incident.

1-ER-13. The district court concluded a reasonable jury could find that

Defendants made deliberate mischaracterizations and material

omissions of Plaintiff's statements regarding the date of her attack and

when she returned to Panaca. 1-ER-13-14.

The court also found a genuine dispute over whether Defendants

deliberately mischaracterized Plaintiff's statements about the location

of her attack. 1-ER-14. Defendants not only omitted Plaintiff's specific

description of the location of her attack, but they falsely wrote in their reports that she "appeared unsure" and told them it was on "Flamingo," even though Plaintiff never said this. 1-ER-14-15.

The court found that "a reasonable jury could find that Defendants intentionally omitted crucial information regarding Plaintiff's description of the identity of her assailant." *Id.* It also found, "it could be reasonably inferred that Defendants intentionally misrepresented or omitted key identifying features which would have distinguished the two incidents." 1-ER-16. And finally, the court found that "a reasonable jury could find that the detectives embellished Plaintiff's account of what she did to her attacker—turning a 'cut' into an amputation—in an effort to eliminate any doubt that Plaintiff severed Bailey's penis." 1-ER-17. This was exacerbated by the Defendants' fabrication that Lobato "snapped" and therefore did not remember what else happened.

The court found sufficient evidence of causation for a reasonable jury to conclude that the prosecutors reviewed the fabricated reports and "the information contained within those reports had a substantial

or controlling impact on their evaluation of the evidence and their theory of the case." 1-ER-18.

The court found Defendants were not entitled to qualified immunity because the law was "clearly established by 2001 that Plaintiff had a right not to be subjected to criminal charges based on material omissions or mischaracterizations in a suspect's statement or confession." 1-ER-18-19 (citing *Liston v. City of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997); *United States v. Stanert*, 762 F.2d 775, 781 (9th Cir. 1985)).

The court also denied summary judgment on Plaintiff's Fourth Amendment claim, conspiracy claim, and state-law claims. 1-ER-20-21, 23-29.

## SUMMARY OF ARGUMENT

The Court should dismiss Defendants' appeal and remand the case for trial. This appeal has already deferred the setting of a trial date and wastes judicial resources by asking this Court to improperly consider the Defendants' version of the facts. Defendants' opening brief fails to accept the facts as found by the district court and the facts and inferences in the light most favorable to Plaintiff. At its core,

Defendants' argument on appeal is that the Court must accept their version of events—in which they made only careless mistakes in their police reports, not knowing fabrications—contrary to the district court's findings.

An argument about whose story to believe and what the evidence shows must be made to the jury, not an appellate court. *Johnson v. Jones*, 515 U.S. 304, 313 (1995). Even if this Court were to look at the facts in this case, it would reach the same conclusion as the district court—a reasonable jury could conclude Defendants violated Plaintiff's constitutional rights.

Similarly, if the Court were to reach the legal question of whether the law was clearly established in 2001 that a police officer could not knowingly fabricate evidence against a criminal suspect, the answer to that question is plainly yes. *Devereaux v. Abbey*, 263 F.3d 1070, 1075-76 (9th Cir. 2001) (*en banc*). Fabricated evidence in the evidentiary record corrupts a criminal process regardless of whether there is probable cause, and regardless of whether the fabricated evidence was turned over to the prosecutor. And, in fact, turning over fabricated evidence to the prosecutor illustrates, rather than negates, causation.

*Id.*; *Caldwell v. City & Cnty. of San Francisco*, 889 F.3d 1105, 1117 (9th Cir. 2018). Fabricating evidence used in a criminal case violates due process and its existence cannot be the basis for probable cause, regardless of whether it has been given to a prosecutor. *Blankenhorn v. City of Orange*, 485 F.3d 463, 482 (9th Cir. 2007). Because obtaining a prosecution and conviction was the foreseeable consequence—and very purpose—of providing their reports to the prosecutor, Defendants undoubtedly caused Lobato harm. *Monroe v. Pape*, 365 U.S. 167, 187 (1961); *Stoot v. City of Everett*, 582 F.3d 910, 926 (9th Cir. 2009). Defendants' arguments about the fact-bound question of causation both exceed jurisdiction and fail on the merits.

And finally, because this Court has no jurisdiction over the Defendants' fact-based arguments about whether they committed a constitutional violation against Plaintiff, this Court has no basis to exercise pendent appellate jurisdiction over the district court's denial of summary judgment on the state-law claims.

# ARGUMENT

## Standard of Review

When reviewing the denial of qualified immunity at the summary judgment stage, this Court "may not consider questions of evidence sufficiency, i.e., which facts a party may, or may not, be able to prove at trial." *CarePartners, LLC v. Lashway*, 545 F.3d 867, 875 (9th Cir. 2008) (internal quotation marks omitted). This Court "lacks the power to reassess facts on interlocutory review." *George v. Martin*, 736 F.3d 829, 835 n.9 (9th Cir. 2013).

Defendants suggest that this Court may conduct its own *de novo* review of the facts because they claim there is an "exception" permitting review of a district court's determinations that are "blatantly contradict[ed]" by the record. *See* Defs.' Br. at 31 (citing *George*, 726 F.3d at 836); *id.* at 39. There are two problems with this suggestion. First, *George* specifically refused to find such a broad "exception" that would permit courts to simply re-weigh record evidence in an interlocutory appeal. Instead, the blatant-contradiction concept applies only when "no reasonable jury" could believe a party's version of events, such as when there is videotape contradicting their account. *Estate of*

*Anderson v. Marsh*, 985 F.3d 726, 731 n.3 (9th Cir. 2021). Second, even if there were such an "exception," it plainly cannot apply here; there is no evidence "blatantly contradicting" Plaintiff's version of events in any realm near that of a video or objective evidence showing something "no reasonable jury could believe." *Scott v. Harris*, 550 U.S. 272, 380 (2007).

## I.    This Court Must Remand for Trial on Plaintiff's Fourteenth Amendment Claim

### A.    This Court Lacks Jurisdiction to Review Defendants' Fact-Based Challenge to the District Court's Ruling

This Court independently examines its jurisdiction, and Defendants bear the burden of establishing jurisdiction. *In re Ozenne*, 841 F.3d 810, 814 (9th Cir. 2016). Federal appellate courts generally have jurisdiction to review only "final decisions." 28 U.S.C. § 1291; *Ortiz v. Jordan*, 562 U.S. 180, 188 (2011). Interlocutory appeals, like this one, therefore "are the exception, not the rule." *Johnson*, 515 U.S. at 309.

Under the narrow collateral-order doctrine, this Court may have jurisdiction to review a government official's interlocutory appeal from a denial of qualified immunity at the summary judgment stage, to the extent the appeal involves "neat abstract issues of law." *Id.* at 317 (internal quotation marks and citation omitted); *see Mitchell v. Forsyth*,

472 U.S. 511, 528 (1985). However, to ensure that the review is *collateral*, the legal question at issue must be "completely separate from the merits of the action." *Plumhoff v. Rickard*, 572 U.S. 765, 772, (2014). Failure to raise an issue that is "completely separate from the merits of the action" is fatal to appellate jurisdiction, regardless of the type of claim at issue. *E.g., In re Roundup Prod. Liab. Litig.*, 2022 WL 16646693, at *2 (9th Cir. Nov. 3, 2022); *Adams v. Speers*, 473 F.3d 989, 991 (9th Cir. 2007).

To determine jurisdiction, the Court examines the *substance* of Defendants' arguments, beyond mere labels. *George,* 736 F.3d at 834; *Estate of Anderson*, 985 F.3d at 731; *Stinson v. Gauger*, 868 F.3d 516, 525 (7th Cir. 2015) (*en banc*). As the Seventh Circuit has explained, "an appellant challenging a district court's denial of qualified immunity effectively pleads himself out of court by interposing disputed factual issues in his argument." *Gutierrez v. Kermon*, 722 F.3d 1003, 1010 (7th Cir. 2013); This Court has applied the same rule. *See Maropulos v. County of Los Angeles*, 560 F.3d 974, 975 (9th Cir. 2009).

Thus, Defendants could have hypothetically raised legal issues concerning qualified immunity that were severable from the merits and

that might have satisfied the collateral bar doctrine. They have failed to do so. Defendants repeatedly argue that they were, at most, careless, did not intentionally fabricate or misrepresent any evidence, and contest Plaintiff's sworn deposition testimony. Defs.' Br. at 29, 38, 40-45, 51.

In sum, Defendants challenge the district court's finding that a reasonable jury could find they violated Plaintiff's Fourteenth Amendment rights. Their entire argument and recitation of the facts is limited to their version of the facts and the inferences that can be drawn therefrom. It is the jury's job to resolve factual disputes about intentionality. *See Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 931 (9th Cir. 2004).

Defendants cannot dodge the jurisdictional bar by couching factual arguments in legal terms, as they attempt to do here. *Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011) (rejecting "back-door effort" to contest the facts and dismissing qualified immunity appeal for lack of jurisdiction). Defendants attempt to characterize their argument as about the "materiality," not the sufficiency, of the disputed facts, but there can be no serious argument that the facts found by the district

court—whether Defendants falsified and omitted facts about the location, time, and nature of the attack described by Lobato—are *material*. Materiality concerns "disputes over facts that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Clearly, the central issue is whether Defendants fabricated the evidence purporting to link Lobato to Bailey's murder.

In sum, this Court has no jurisdiction to review Defendants' challenge to the district court's factual conclusions.

## B. A Reasonable Jury Could Find that Defendants Violated Plaintiff's Fourteenth Amendment Rights

To the extent the Court considers Defendants' constitutional violation argument, the evidence and case law clearly supports Plaintiff. Defendants fabricated evidence—indeed, they came up with the very idea that Lobato committed a murder when she described surviving a rape attempt—against Lobato, which was used to wrongfully arrest, prosecute, convict, and incarcerate her for nearly 17 years.

There is a clearly established due process right not to be subjected to criminal charges on the basis of false evidence that was fabricated by the government. This "proposition is virtually self-evident." *Devereaux*,

263 F.3d at 1074-75. Evidence can be fabricated in myriad ways. *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). This Circuit has distinguished between direct deliberate fabrication and indirect or circumstantial fabrication. Plaintiff may point to both direct and circumstantial evidence when it comes to proving *direct* deliberate fabrication of evidence. *See Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1095 (9th Cir. 2005); *cf. Costanich v. Dep't of Social & Health Servs.*, 627 F.3d 1101, 1113 (9th Cir 2010) ("An admission by a defendant … is not required to survive summary judgment. Resolution of disputed material facts is the special province of the factfinder."). That is particularly true as it relates to Defendants' intent (*i.e.*, whether their actions were deliberate). *See, e.g., Mellen v. Winn*, 900 F.3d 1085, 1101 (9th Cir. 2018) (pointing to circumstantial evidence of intent as basis for denying summary judgment in wrongful conviction case on due process claim). In this case, Plaintiff has presented extensive evidence of direct and indirect fabrication.

1.    **Direct Fabrication: Events that Never Happened or Words Never Said**

Direct fabrication of evidence can occur where reports or documents include things that are simply false; where reports or

documents, for example, "contain[] evidence" that does not exist or purports to document statements that were "never made." *Costanich*, 627 F.3d at 1112 (direct fabrication includes misquoting, misrepresenting, and falsifying witness statements); *see also Caldwell*, 899 F.3d at 1112 (triable issue of fact as to evidence fabrication where evidence included "falsified notes"). The Constitution "prohibits the deliberate fabrication of evidence whether or not the officer knows that the person is innocent." *Spencer*, 857 F.3d at 799-800.

Defendants' assertion that it is "not alleged the Detectives made up quotes … or attributed statements that did not exist," Defs.' Br. at 62, is entirely untrue. Not only are these things alleged extensively in Plaintiff's briefing below, 2-ER-107-09, but they make up part of the district court's decision denying summary judgment, *See, e.g.*, 1-ER-10, 13, 17 (recognizing that Plaintiff contends she "never made" certain statements and quoting this very phrase from *Spencer*, 857 F.3d at 793).

There are numerous examples of direct fabrication in the record. Examples include:

First, both the Arrest Report and Officer's Report contain statements suggesting Lobato said she was attacked in an enclosed area similar to a jail cell—the implication, of course, was to make it appear that Lobato was describing an event like the murder of Bailey (where he was found in a trash enclosure) rather than the Budget Suites attack that took place in a parking lot, with a fountain nearby. But Plaintiff never said the jail cell looked like an enclosure where she was attacked (and the place she was attacked did not have such an enclosure). As the district court found, this is a material deliberate fabrication.

Second, to try to account for the fact that Lobato only may have slashed her attacker's penis one time (while he was alive), but Bailey's penis had been completely severed from his dead body, both the Arrest Report and Officer's Report include false statements that Plaintiff never made concerning the status of the attacker's penis. The Arrest Report claims that Plaintiff said she "thought she had severed the penis from the male's body," 21-ER-4838, and the Officer's Report claims—in quotes—that Plaintiff said she "cut it off" (in quotation marks), 11-ER-2396. This is not at all what Plaintiff said. During the interrogation, Plaintiff never said she "thought she had severed the penis from the

male's body" and she did not say she had "cut it off," but instead actually told the detectives "I think I was trying to cut it off, but I don't know if I actually did." 11-ER-2505. As the district court found, this is deliberate fabrication. *See Spencer*, 857 F.3d at 798-99 (false report including use of quotations).

The Officer's Report claims that Lobato said she "snapped." 11-ER-2396 (putting "snapped" in quotation marks). Lobato never said this. 6-ER-1356. The same goes for Defendants' claim that she "completely lost it." This, too, is direct, deliberate fabrication—or at least, a reasonable jury could easily so find. *Id.*

2. **Direct Fabrication: Misrepresentations, Mischaracterizations, and Omissions that Portray the Evidence in a False or Misleading Light**

This Circuit has not restricted deliberate fabrication to statements that were "never made." Instead, it is clearly established that direct fabrication can also occur where officials "deliberately mischaracterize[]" evidence. *Spencer*, 857 F.3d 798; *see also Costanich*, 627 F.3d 1112 ("an interviewer who deliberately mischaracterizes witness statements in her investigative report … commits a constitutional violation"). In *Costanich*, for example, this Court looked

both to statements that were "never made" in the reports at issue but also other mischaracterizations and misrepresentations within the reports about the nature and quality of the investigation that took place. 627 F.3d at 1112. These misrepresentations included situations where the reports "twisted the[] words" attributed to witnesses; where the mischaracterization included "suggestions" that purportedly "lent credibility" to the report. While mere mistakes of "tone" or carelessness" are not actionable, *Spencer*, 857 F.3d at 798, misrepresentations and mischaracterizations that alter the message conveyed by a police report are actionable. *Costanich*, 627 F.3d at 1112-13. *Costanich* also made clear that an admission of falsifying the record is not necessary to survive summary judgment and that the argument that errors in the reports should be seen as mere mistakes of "tone" or something of that sort "is untenable in light of the principle that, on summary judgment, [the court] must draw all factual inferences in favor of the nonmoving party." *Id.*

As the district court found, the evidence presented in this case would allow a reasonable jury to find both direct and circumstantial evidence of deliberate fabrication. This evidence includes the

discrepancy in the timing of the two events (May versus July); their different locations (a hotel on the west side versus a bank on the east side of town); the drastic differences in the state of the person who attacked Plaintiff (cut once, living, and "giant") versus Bailey (viciously killed, skinny, and had his penis severed *postmortem*).

In addition, there is powerful direct evidence Defendants knew the attack on Lobato and the Bailey murder were unrelated events happening over a month apart but still wrote—in the same documents—she should be charged with the crime. After surviving the attack, Lobato told Defendants she drove her car to Davis's home because she was afraid and did not want to be targeted by leaving her car for a while. Pyszkowski and Lobato retrieved the car as it was in the process of being towed, and Pyszkowski obtained a receipt for paying the driver not to tow it. 11-ER-2576. Pyszkowski, and the tow receipt verified that Lobato's car was at Davis's house the week following the attack, long before Bailey was killed. In the Officer's Report—the document purporting to connect Lobato to killing Bailey—the Defendants wrote that "[i]t was determined that the incident Lobato had mentioned during her statement about leaving her vehicle at her

ex-boyfriend's house had *actually happened the month previously*." 11-ER-2399 (emphasis added). But, the entire series of events Lobato "mentioned during her statement" as a child escaping a sexual assault "had actually happened the month previously," they just fabricated purported inculpatory information in these reports to make it appear as if Lobato had committed the murder.

As the district court found, Defendants bolstered their efforts to obscure and make it falsely appear that Lobato was referring to the July 8 Bailey murder, by repeatedly mischaracterizing the timing described in Lobato's statements. For example, Defendants wrote in the Arrest Report, "on Friday, July 13th, [Lobato] returned to Panaca sometime after the incident." 1-ER-14. Defendants made a similar misleading statement in the Officer's Report. 11-ER-2396 ("Lobato said she went back to Panaca on July 13th and contacted a doctor and was prescribed Prozac due to her depression from the incident."). However, Defendants knew that Lobato was in Panaca, not Las Vegas, before the murder. The implication was that Lobato was in Las Vegas at the time of the July 8 Bailey murder and went to Panaca after the murder. This, of course, was false. Lobato was not talking about returning to Panaca

because she was depressed about killing Bailey. Instead, she was describing events that Defendants themselves knew occurred long before the murder.

Defendants argue that the "exculpatory" material was included in what Defendants provided to the prosecutors. Defs.' Br. at 42. This is both incorrect and irrelevant. For one, there is a genuine dispute of material fact, especially since the contemporaneous notes of the interviews were destroyed, and Defendants selectively recorded their interviews with Lobato and witnesses. *See* 7-ER-1466-67; 20-ER-4602, 4627-28, 4743, 4752-54, 4769, 4778; 21-ER-4821-23, 4829. That aside, the contention is irrelevant. Plaintiff's claim is not impacted by the fact Defendants' reports include some things—or some version of things—that were exculpatory. Instead, a reasonable jury could easily conclude that Defendants included some version of the exculpatory evidence in their reports but buttressed against other misrepresentations for the precise purpose of trying to falsely undermine that evidence because they knew it had to be accounted for if they were going to pin this murder on Plaintiff. *See* 1-ER-13.

Even more egregiously, the Officer's Report indicates that the officers showed Lobato a photograph of Bailey and then states that she said "she could not recognize him [referring to the photograph], and that she had put him [Duran Bailey] out of my mind." 1-ER-16. It is true that Plaintiff said she did not recognize *the picture*, but it is untrue that she was referring to *Bailey* when she said she put her *attacker* out of her mind. Defendants' report added the misrepresentation that she was referring to Bailey as the person she had put out of her mind when she did not say that and could not have been referring to him (because she has never met or encountered him). As the district court found, there is an obvious reason why these sorts of misrepresentations occur in the reports: the Defendants knew they were dealing with two separate incidents but falsely tried to overcome that fact so they could wrongfully charge Plaintiff with a crime she did not commit. 1-ER-16.

On Plaintiff's facts, the overarching fabrication is that Defendants took an innocent teenage girl's description of defending herself from a sexual assault and somehow portrayed that as if it were an entirely different incident in which a man was brutally murdered, wrapped in plastic, and mutilated postmortem. No reasonable officer would think

that Plaintiff was involved in or describing the murder of Bailey.

Nothing about the date, time, location, or circumstances matched up.

And yet, Defendants' fabrications and misrepresentations in the Arrest

Report and Officer Report were so successful that Lobato was

wrongfully convicted for a crime she had nothing to do with. Thus, while

Defendants do not admit their deliberate acts, these essential factual

differences on their own supply substantial direct and circumstantial

evidence of deliberate fabrication and, as the district court found, the

jury must be permitted to weigh these facts at trial.

### 3.    Evidence of Indirect or Circumstantial Fabrication

Plaintiff's claim is also supported by the circumstantial route of

showing fabrication; namely by pointing to evidence the Defendants

knew or should have known that Lobato was innocent yet continued

their investigation nevertheless. *See Spencer*, 857 F.3d at 799; *see also*

*Costanich*, 627 F.3d at 1111.

Here, the evidence as laid out above thoroughly supports the

contention that the officers knew, or should have known, that Lobato

was innocent but continued their investigation anyway. In addition to

the evidence discussed above, the record contains other evidence that

the officers knew, but deliberately disregarded that Lobato was innocent. Not only did Defendants ignore the absence of physical evidence tying Lobato to the brutal crime, but they disregarded Twining's phone records and threatened Twining for providing that evidence; refused to undertake basic investigative tasks that would have confirmed Plaintiff's innocence, including conducting any follow-up regarding evidence of her innocence; did not document the entirety of the exculpatory evidence they encountered; and discarded notes of witness statements during interviews, leaving the Arrest Report and Officer's Report as the primary record of their investigation.

## C. The Law Was Clearly Established that an Officer Could Not Fabricate Evidence against a Criminal Defendant

Defendants' argument that the law was not clearly established revolves entirely around their version of the facts. Defs.' Br. at 48-51. This stands in direct opposition to the district court's factual findings. This Court therefore lacks jurisdiction to consider the argument.

Even assuming, however, that the Court has jurisdiction to review this argument, the law was clearly established long before July 2001. Under current law, qualified immunity "attaches when an official's conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (internal quotation marks and citation omitted).[5]

At its core, the doctrine focuses on the idea of notice and the "salient question … is whether the state of the law" when the conduct occurred gave the officers "fair warning" the alleged conduct was unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). There is no requirement of an exact case on point, as "officials can still be on notice

---

[5] There is a substantial argument that qualified immunity lacks lawful basis. For one, the text of 42 U.S.C. § 1983 makes no mention of immunity or an exception to the mandatory use of the words "shall be liable." *See* 42 U.S.C. § 1983. In addition, it was not until the second half of the twentieth century that the Supreme Court invented qualified immunity by reference to common law immunities, *see Pierson v. Ray*, 386 U.S. 547, 555, 557 (1967), but doing so was also inconsistent with the text of the statute the 1871 Congress passed which expressly forbids consideration of such background rules in assessing § 1983. *See, e.g.*, *Rogers v. Jarrett*, __F.4th__, 2023 WL 2706752, at *7 (5th Cir. Mar. 30, 2023) (Willett, concurring) ("the doctrine does not merely *complement* the text—it brazenly *contradicts* it"); *Zadeh v. Robinson*, 928 F.3d 457, 479 (5th Cir. 2019) (Willett, J., concurring); *Jackson v. City of Cleveland, et al.*, 920 F.3d 340, 367 (6th Cir. 2019); Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. R. 201 (2023); William Baude, *Is Qualified Immunity Unlawful?*, 106 Cal. L. Rev. 45 (2018); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797 (2018); *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (a "one-sided approach to qualified immunity transforms the doctrine into an absolute shield for law enforcement officers").

that their conduct violates established law even in novel factual circumstances." *Id.* at 741 (citing *United States v. Lanier*, 520 U.S. 259 (1997)); *see Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866-67 (2017) ("It is not necessary, of course, that 'the very action in question has previously been held unlawful.' That is, an officer might lose qualified immunity even if there is no reported case 'directly on point.'") (citations omitted); *Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020).

Were it otherwise, qualified immunity would turn into a form of absolute immunity. *Deorle v. Rutherford*, 272 F.3d 1272, 1275 (9th Cir. 2001) ("officers would escape responsibility for the most egregious forms of conduct simply because there was no case on all fours prohibiting that particular manifestation of unconstitutional conduct."); *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011) (*en banc*) ("If qualified immunity provided a shield in all novel factual circumstances, officials would rarely, if ever, be held accountable for their unreasonable violations" of the Constitution).

Here, there is no question the Defendants had notice they could not fabricate evidence and that the constitutional prohibition was "obvious." Indeed, every reasonable officer facing the circumstances that

Defendants faced would have understood that they could not make up facts, mischaracterize facts, or omit material facts in a suspect or witness statement. *Costanich*, 627 F.3d at 1111-12 (deliberate mischaracterization of witness statements is a constitutional violation); *Cunningham v. City of Wenatchee*, 345 F.3d 802, 811 (9th Cir. 2003) (finding the right clearly established in 1994); *Liston*, 120 F.3d at 973 (1992 case stating that fabrication may occur by "material false statements or material omissions"). This right "is virtually self-evident." *Devereaux*, 263 F.3d at 1074.

In *Devereaux*, a 2001 case discussing an investigation taking place in 1994, this Court found a due process right not to be subjected to criminal charges on the basis of false evidence deliberately fabricated by the government, and that this right had been clearly established for decades. 263 F.3d at 1075-76 (citing *Pyle v. Kansas*, 317 U.S. 213, 216 (1942)). This Court has reiterated that this "clearly established" right existed well before Defendants' actions at issue in cases describing similar types of deliberate fabrication. *Rodarte v. Gutierrez*, 2023 WL 109723, at *2 (9th Cir. Jan. 5, 2023); *Richards v. Cnty. of San*

*Bernadino*, 39 F.4th 562, 569-71 (9th Cir. 2022); *Caldwell*, 889 F.3d at 1112, 1114-15.

Because the law is clearly established on this point, Defendants seek refuge instead in fact-based arguments, inappropriate for this interlocutory appeal. Defs.' Br. at 49-50 (describing their conduct as merely "careless" and citing case granting qualified immunity because careless investigation did not amount to a constitutional violation). As discussed above, this is contrary to the record and what the district court found.

## II. A Reasonable Jury Could Find Defendants' Fabrication Caused the Violation of Plaintiff's Constitutional Rights

Defendants make causation arguments. For at least five reasons, these arguments fail.

First, Defendants claim that causation is a *legal* question that should be reviewed *de novo,* Defs.' Br. at 32, and cite *Roybal v. Toppenish School District*, 871 F.3d 927, 931 (9th Cir. 2017), as authority for this assertion. They are mistaken. *Roybal* says nothing about the *review* of causation, let alone the concept of causation whatsoever. *Id.* Second, *Roybal* held that the types of district court determinations Defendants challenge here are "'categorically

unreviewable on interlocutory appeal.'" *Id.* (quoting *Eng v. Cooley,* 552 F.3d 1062, 1067 (9th Cir. 2009)).

Beyond that, Defendants are simply wrong. Causation is an intensely factual question, not a legal one, and that is why it is generally for the jury. *Pac. Shores Properties, LLC v. City of Newport Beach*, 720 F.3d 1142, 1168 (9th Cir. 2012). In fact, in *Richards*, a wrongful conviction case involving fabrication claims like this one, this Court addressed the standards applicable to causation by calling it "*factual* causation." 39 F.4th at 572 (emphasis added). This Court recognized factual causation can be satisfied even when a strict showing of "but-for causation cannot be made" and held that a plaintiff "can establish factual causation if [s]he can show a reasonable likelihood that the allegedly fabricated … evidence could have affected the judgment of the jury." *Id.* at 574.

Second, Defendants mistakenly frame their causation arguments as related to but-for causation. Defs.' Br. at 46-48. But, they misunderstand the difference between but-for causation and an intervening or superseding cause that might "sever" the causal chain such that an underlying act is not a proximate cause of the ultimate

harm. The question of whether a prosecutor's actions preclude causation are not but-for causation arguments, they are about superseding/proximate causes, *see Caldwell,* 889 F.3d at 1115 (asking whether prosecutorial action "severs the causal chain"); *Stoot*, 582 F.3d at 926-27 (similar). Here, there is no question that the officers' actions were but-for causes; the (meritless) issue Defendants raise is whether giving information to prosecutors amounts to an intervening or superseding event that cut off their own liability.

Third, Defendants contend that giving fabricated documents to prosecutors somehow breaks the causal chain. They are mistaken. Defendants' proposed rule that prosecutors simply being given evidence the police had fabricated somehow negates causation contradicts established law. The causation rule just described from *Richards*—that causation is met if the evidence could have impacted the judgment of the jury—in fact presumes that prosecutors are the ones prosecuting the case in courtrooms (because the police are not attorneys) and impacted by that evidence.

This Court's decisions have repeatedly rejected the idea Defendants press here. For example, *Stoot* focused on a coerced

confession given to and introduced by a prosecutor and rejected this premise directly, holding the "prosecutor's decision to use the allegedly coerced statements in the affidavit and at arraignment did not serve, as a matter of law, as an intervening or superseding cause that cut off [the officer's] liability." 582 F.3d at 926-27. This Court continued: "Just as a police officer may be held liable when a prosecutor files criminal charges against a defendant without probable cause, so too may an officer be held liable for wrongfully procuring statements then used by the prosecutor to initiate legal proceedings." This Court has likewise held that officers who submit false reports "to the prosecutor may be held liable for damages incurred as a proximate result of those reports." *Blankenhorn*, 485 F.3d at 482.

Moreover, the Supreme Court has held § 1983 must be read "against the background of tort liability that makes a man responsible for the natural consequences of his actions." *Monroe*, 365 U.S. at 189; *see also Stoot*, 582 F.3d at 926. Proximate cause therefore exists where "the injury is of a type that a reasonable person would see as a likely result of the conduct in question." *Spencer*, 857 F.3d at 798.

Here, the obvious "natural consequences" of fabricating these reports is their use by prosecutors; they were not intended to be left sitting in a drawer. Indeed, the entire point of arresting and pursuing Lobato was to secure her conviction. The fact that happened was not only foreseeable; it was the very purpose of these acts.

Additional precedent forecloses Defendants' "given to the prosecutor" argument. For example, in *Crowe v. County of San Diego*, a coerced confession case—where the prosecutor was given the video of the coercive confession but used it to prosecute anyway—this Court rejected a rule that found police officers were not the proximate harm of introducing the confession because the prosecutor, not the officer, introduced the statement. 608 F.3d 406, 430 (9th Cir. 2010). A police officer will not make the decision about what is introduced at trial, but may nonetheless be liable "by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* (quoting *Johnson v. Duffy*, 588 F.2d 740, 743-44 (9th Cir. 1978)). Defendants' arguments cannot be reconciled with these authorities and causation is beyond satisfied.

Fourth, Defendants' arguments about prosecutors run contrary to myriad authorities concerning constitutional violations that involve criminal prosecutions and the deprivation of liberty. Defendants acknowledge (Defs.' Br. at 35), "a § 1983 plaintiff need not be convicted on the basis of the fabricated evidence to have suffered a deprivation of liberty—being criminally charged is enough." *Caldwell*, 889 F.3d at 1115 (citing *Devereaux*, 263 F.3d at 1074-75, and Ninth Cir. Jury Instr. § 9.33). Police work that becomes part of the "evidentiary record" in the authorization of the charges against the plaintiff is sufficient to permit a jury to find causation. *Id.* at 1117; *see also Gregory v. City of Louisville*, 444 F.3d 725, 741 (6th Cir. 2006). Recognizing, as this Court's pattern jury instructions do, that putting evidence in the "evidentiary record" that goes to the prosecutor to cause criminal charges in the first place is sufficient to satisfy causation, necessarily requires that Defendants' "given to the prosecutor" rule fails.

Fifth, and finally, Defendants also suggest that a presumption of prosecutorial independence should be applied to preclude causation as a matter of law. But, for the same reasons explicitly rejected in *Stoot* that recognized the prosecutor's use of evidence is not a superseding cause

where the use of that evidence in a criminal case is the foreseeable consequence of its generation, Defendants' argument fails.

Indeed, the idea of presumption of prosecutorial independence does not apply to a fabrication of evidence claim, only potentially to one under the Fourth Amendment. *See, e.g.*, *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004). This distinction is essential given the difference between the Fourth Amendment, on one hand, and the due process prohibition on fabrication, on the other. Under the Fourth Amendment, given its text, the constitutional question turns on the existence of *probable cause*, and focuses on is whether the post-arrest detention is authorized by something other than the original probable cause after there has been some judicial process. By contrast, the existence or not of probable cause is irrelevant to whether evidence has been fabricated, and so is the question of whether any prosecutorial judgment alters the probable cause analysis. *Spencer*, 857 F.3d at 801. Instead, the introduction of fabricated evidence—at any proceeding and at any moment along the way in the criminal prosecution—taints the entire process, regardless of its form and regardless of whether prosecutors knew about it. *Cf. Mooney v. Holohan*, 294 U.S. 103, 112

(1935) (fabricated evidence "violates the fundamental conceptions of justice which lie at the base of our civil and political institutions."); *Napue v. Illinois*, 360 U.S. 264 (1959) ("The principle that a State may not knowingly use false evidence … to obtain a tainted conviction" is "implicit in any concept of ordered liberty[.]"; *Miller v. Pate*, 368 U.S. 1, 7 (1967) (the "Fourteenth Amendment cannot tolerate a state criminal conviction obtained by the knowing use of false evidence"); *Richards*, 39 F.4th at 573 ("The deliberate fabrication of evidence implicates a plaintiff's fundamental right to a fair trial. And this right is implicated whenever the state deliberately fabricates evidence, regardless of the plaintiff's innocence or guilt. It would be anomalous to turn away a plaintiff who has been injured by deliberately fabricated evidence simply because that evidence alone was not sufficient to cause the conviction—the right to a fair trial is impinged either way.")

Assuming *arguendo* prosecutorial discretion mattered at all, Defendants' argument is belied by the record, which—as the district court found—would allow a reasonable jury to find in Plaintiff's favor. There is sometimes a presumption that the prosecutor filing the complaint exercised independent judgment in determining *probable*

*cause* (a Fourth Amendment concept, not applicable to a due process claim), thus potentially breaking the chain of causation between the officers' fabrication in initiating pretrial seizure and the plaintiff's injury; but this presumption is overcome if the officers "knowingly provide misinformation to [the prosecutor], concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Awabdy*, 368 F.3d at 1067; *Caldwell*, 889 F.3d at 1116 ("Deliberately fabricated evidence in a prosecutor's file can rebut any presumption of prosecutorial independence"); *Rodarte v. Gutierrez*, 2023 WL 109723, at *2 (9th Cir. Jan. 5, 2023) (rejecting similar causation argument).

As the district court found, "[i]f a defendant knowingly provided fabricated evidence to the prosecutors or concealed exculpatory evidence, the prosecutor's actions cannot be considered independent, and do not break the causal chain." 1-ER-17. Defendants' false statements, omissions, and mischaracterizations in the Officer's Report and Arrest Report put all of the other evidence (including exculpatory evidence) Defendants gathered in a different light. A reasonable jury

could find that the fabricated evidence "had a substantial or controlling impact on [prosecutors'] evaluation of the evidence and their theory of the case." 1-ER-18.

Defendants argue that the prosecutor still believes there was probable cause to prosecutor Plaintiff. Defs.' Br. at 48. This actually proves the point: the Defendants never disclosed their fabrications, which is why there is no "independent" judgment in the first place. *Caldwell*, 889 F.3d at 1117-18. The discussion of probable cause is also a red herring. Plaintiff contends there was no probable cause to arrest and prosecute her, but even if there was, that would not impact the fabrication claim. *Spencer*, 857 F.3d at 801. Plaintiff has a constitutional right not to be charged and prosecuted based on fabricated evidence regardless of whether probable cause exists absent the fabricated evidence. *Id.*; *Halsey v. Pfeiffer*, 750 F.3d 273, 292-93 (3d Cir. 2014) (even where probable cause exists, "no sensible concept of ordered liberty is consistent with law enforcement cooking up its own evidence").

## III. This Court Must Remand for Trial on Plaintiff's Fourth Amendment Claim

### A. This Court Lacks Jurisdiction to Review Defendants' Fact-Based Challenge to the District Court's Ruling

To establish a Fourth Amendment violation of detention absent probable cause, Plaintiff need only demonstrate that: (1) her detention was made in the absence of probable cause; and (2) Defendants proximately caused the unlawful detention. *Manuel v. City of Joliet*, 137 S. Ct. 911, 918-19 (2017). The district court found that genuine issues of material fact existed on whether Plaintiff's detention occurred without probable cause. 1-ER-21. For the reasons enumerated above, this Court does not have jurisdiction to review this finding.

### B. Probable Cause Cannot Be Based on Fabricated Evidence

As the district court found, the record taken in the light most favorable to Plaintiff shows that Defendants knew that Lobato was describing an entirely different incident and was not confessing to the Bailey murder. Defendants concealed the glaring inconsistencies between her statement about the May attack and the facts of the Bailey murder by fabricating evidence, and such fabricated evidence cannot be the basis for a probable cause determination. *See Manuel*, 137 S. Ct. at 920 n.8 ("[I]f the proceeding is tainted—as here, by fabricated

evidence—and the result is that probable cause is lacking, then the ensuing pretrial detention violates the confined person's Fourth Amendment rights."); *Scafidi v. LVMPD*, 966 F.3d 960, 963-64 (9th Cir. 2020). The fact that Plaintiff "received a preliminary hearing, two criminal trials, and two criminal trial appeals," Defs.' Br. at 56, is irrelevant where Defendants' fabricated evidence comprised the basis of Plaintiff's arrest and prosecution.

Defendants urge this Court to decide that probable cause existed as a matter of law. Defs.' Br. at 55. This would require the Court to resolve factual disputes in Defendants' favor, something it cannot do. "In civil cases, the existence of probable cause is a question for the jury." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984). The court cannot grant summary judgment "when there is a genuine dispute as to 'the facts and circumstances within an arresting officer's knowledge' or 'what the officer and claimant did or failed to do.'" *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th Cir. 2009). Here, there is such a dispute. Plaintiff and Defendants present materially different versions of what Plaintiff said during her interview. Defendants claim that Plaintiff was confused about the location, the date, and the circumstances of the

attack she described. Plaintiff alleges that she was very clear about where she was attacked (opposite side of town from Bailey's murder), when it was ("over a month ago"), the characteristics of the person who did it (a "giant"), and what she did (one slicing motion towards her attacker while he was alive). Notably, Defendants cite to their own fabricated Arrest Report in support of their argument that there was probable cause. Defs.' Br. at 55.

Defendants also cite to Johnson's statement to them about what Tienken allegedly told her Lobato told Tienken. But even the Defendants admitted that Johnson's statement failed to provide probable cause. 3-ER-548, 551-54, 556-57. Moreover, "[p]olice officers have a duty to conduct an investigation into the basis of a witness' report." *Hopkins*, 573 F.3d at 767 (citation omitted; cleaned up). Once the Defendants spoke with Plaintiff, they knew she was describing an attack she suffered weeks before the death of Bailey, and that there was no connection between Plaintiff and the Bailey murder.

Defendants' discussion of the opinions of Plaintiff's expert Sue Peters is also irrelevant. Experts cannot provide "legal conclusions as to the ultimate issues in the case," such as probable cause. *Torres v. City*

*of Los Angeles*, 548 F.3d 1197, 1214 n.11 (9th Cir. 2008). Moreover,

Peters did not testify at her deposition that Defendants *had* probable

cause to arrest Lobato, but that they were able to "craft" a "probable

cause statement." 20-ER-4541. This only supports Plaintiff's argument

that Defendants fabricated evidence.

### C.     Collateral Estoppel Does Not Apply

The fact that there was a probable cause finding at Plaintiff's

preliminary hearing does not collaterally estop Plaintiff from pursuing

her Fourth Amendment claim.

First, federal law and not state law governs the application of

collateral estoppel where is no extant state-court judgment, and federal

courts are required only "to give preclusive effect to state court

*judgments.*" *Allen v. McCurry*, 449 U.S. 90, 96-98 (1980) (emphasis

added); *Migra v. Warrant City Sch. Dist.*, 465 U.S. 75, 81-82 (1984).

Here, Lobato's conviction was vacated and there is no judgment. A

vacated criminal judgment "cannot serve as the basis for a disposition

on the grounds of res judicata or collateral estoppel." *Mills v. Covina*,

921 F.3d 1161, 1170 n.2 (9th Cir. 2019); *Bagley v. CMC Real Estate

Corp.*, 923 F.2d 758, 762 (9th Cir. 1991); *Ornellas v. Oakley*, 618 F.2d

1351, 1356 (9th Cir. 1980); *see also* Wright & Miller, Fed. Prac. & Proc. §§ 4427, 4432-33.

Federal courts have rejected Defendants' precise argument—that a judicial determination in an original proceeding is a barrier to one in a subsequent civil suit when there is no extant judgment. *E.g., Evans v. Katalinic*, 445 F.3d 953, 955-56 (7th Cir. 2006); *Peterson v. Heymes*, 931 F.3d 546, 554-55 (6th Cir. 2019); *O'Connell v. Alejo*, 2020 WL 1244852, at *4 (D. Colo. Mar. 16, 2020); *Dukes v. City of Albany*, 289 F. Supp. 3d 387, 393 (N.D.N.Y. 2018).

Even if Nevada law applied, the result is the same. Nevada recognizes there can be no subsequent estoppel where there is no extant judgment. *Horvath v. Gladstone*, 637 P.2d 531, 533 (Nev. 1981); *Holt v. Regional Trustee Servs. Corp.*, 1266 P.3d 602, 605 (Nev. 2011); *In re Sandoval*, 232 P.3d 422, 424 (Nev. 2010); *Alcantara ex rel. Alcantara v. Wal-mart Stores, Inc.*, 321 P.3d 912, 918 (Nev. 2014).

The Nevada Supreme Court has ruled that the "doctrine of collateral estoppel is not concerned with interlocutory rulings," *Woods v. City of Reno*, 2018 WL 493015, at *10 (D. Nev. Jan. 18, 2018) (citing *Bull v. McCuskey*, 615 P.2d 957, 960 (Nev. 1980)). As a result, under

Nevada law, a finding of probable cause in a preliminary hearing does *not* preclude a plaintiff from litigating the issue in a subsequent tort suit, particularly where there is "false testimony or suppressed facts." *See Scafidi*, 966 F.3d at 963 ("[T]he Nevada Supreme Court recognized that a probable cause determination in a preliminary hearing does not preclude a plaintiff from litigating that issue in a subsequent suit.") (citing *Jordan v. State ex rel. Dep't of Motor Vehicles and Pub. Safety*, 110 P.3d 30, 48-49 (Nev. 2005)). Here, Thowsen lied at the preliminary hearing about key inculpatory facts and omitted material exculpatory facts. *See* 7-ER-1438-45, 1453. As a result, Plaintiff cannot be precluded from litigating probable cause in this case. *See Awabdy*, 368 F.3d at 1068; *Wige v. City of Los Angeles*, 713 F.3d 1183, 1185-86 (9th Cir. 2013).

### D. The Law Was Clearly Established that Officers Could Not Base Probable Cause on Fabricated Evidence

Defendants' argument that the law on Plaintiff's Fourth Amendment claim was not clearly established at the time consists of two cursory, conclusory sentences without citation to authority. Defs.' Br. at 56. This constitutes waiver. *E.g., California v. Azar*, 911 F.3d 558, 573 n.1 (9th Cir. 2018) (undeveloped arguments are waived); *Christian*

*Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 487-88 (9th Cir. 2010).

In any event, the law has been clearly established long before 2001 that police officers could not fabricate evidence (such as by creating false statements or making material omissions) in order to obtain the arrest or detention of a person. *E.g.*, *Franks v. Delaware*, 438 U.S. 154 (1978); *Stanert*, 762 F.2d at 780-81; *Smiddy v. Varney*, 665 F.2d 261, 267 (9th Cir. 1981); *Liston*, 120 F.3d at 973.

## IV. This Court Must Remand for Trial on Plaintiff's Conspiracy Claim

### A. This Court Lacks Jurisdiction to Review Defendants' Fact-Based Challenge to the District Court's Ruling

The district court found that a reasonable jury could find Plaintiff on her conspiracy claim. 1-ER-24. The court described this evidence in detail. 1-ER-24-25. Defendants' challenge to Plaintiff's § 1983 conspiracy claim rests on the same dispute of fact as their challenge to Plaintiff's fabrication claim. Defs.' Br. at 58. Thus, this Court lacks jurisdiction to consider it.

### B. The Intracorporate Conspiracy Doctrine Does Not Apply

The intra-corporate conspiracy doctrine does not bar Plaintiff's claim. To the contrary, this Court has "permitted conspiracy claims to

go forward where 'a jury could infer, based on circumstantial evidence,' that officers agreed to violate a suspect's constitutional rights." 1-ER-25 (quoting *Dirks v. Martinez*, 414 F. App'x 961, 962 (9th Cir. 2011) (denying qualified immunity on conspiracy claim against three Los Angeles County sheriff deputies); *Cameron v. Craig*, 713 F.3d 1012, 1013 (9th Cir. 2013) (reversing grant of summary judgment with regard to claim that officers from the same agency conspired to abuse their power as officers and violate constitutional rights); *Baldwin v. Placer Cnty.*, 418 F.3d 966, 970-71 (9th Cir. 2005) (affirming denial of summary judgment with regard to conspiracy claim against officers from the same entity); *Gilbrook v. City of Westminster*, 177 F.3d 839, 857 (9th Cir. 1999) (affirming jury verdict finding unlawful conspiracy to violate constitutional rights against a group of officers and employees of the city); *cf. Harris v. Roderick*, 126 F.3d 1189, 1195-96 (9th Cir. 1997).

The intracorporate conspiracy doctrine originated in the antitrust context and derived from the unique nature of conspiracies in that context. *See Ziglar*, 137 S. Ct. at 1868; *Washington v. Duty Free Shoppers*, 696 F. Supp. 1323, 1325-28 (N.D. Cal. 1988) (explaining why

the rationale behind the doctrine does not fit with civil rights cases and should not be extended to conspiracy claims in the civil rights context). The nature of § 1983 claims precludes an application of the doctrine to those claims. As noted in *Ziglar*, the logical foundation of the intracorporate conspiracy doctrine is that agents of a corporate entity act on behalf of their principal, and their individual actions will be imputed to the corporate entity. That premise does not apply in the context of § 1983 claims, where *Monell* and subsequent jurisprudence conclusively hold that actions of municipal employees cannot be imputed to the municipality. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). In other words, the fundamental premise of the intracorporate conspiracy doctrine—that the actions of the agent are imputed to the principal—cannot apply to § 1983 actions. To conclude otherwise would be to hold, in effect, that LVMPD is vicariously responsible for Defendants' conduct. This result cannot be squared with *Monell* and forecloses applying the doctrine here.

## C. The Law Was Clearly Established that Officers Could Not Conspire to Fabricate Evidence

Defendants are not entitled to qualified immunity on the ground that the law was not clearly established in 2001. The case they cite,

*Fagaza v. FBI*, 965 F.3d 1015 (9th Cir. 2020), was reversed and remanded, *FBI v. Fagaza*, 142 S. Ct. 1051 (2022), but it does not support their position anyway. *Fazaga* and the case on which it relies, *Ziglar*, examine whether federal officials from the same federal entity would have known that they were engaging in an unlawful conspiracy under § 1985(3) when they entered agreements among themselves or made policy decisions for that entity. § 1983 and § 1985(3) are different statutes with different purposes and different elements. And *Fazaga* and *Ziglar* are limited to agreements reached by federal officials in their official capacities. *Fagaza*, 965 F.3d at 1060; *Ziglar*, 137 S. Ct. at 1867-68. Here, Defendants were police officers working together to frame an innocent person, not federal officials developing national policy.

## V. There Is No Pendent Jurisdiction to Review the District Court's Denial of Summary Judgment on the State-Law Claims

There is no right to interlocutory appeal of the denial of summary judgment on Plaintiff's state-law claims. Federal qualified immunity does not shield a defendant from state-law claims. *See Cousins v. Lockyer*, 568 F.3d 1063, 1072 (9th Cir. 2009).

Under the doctrine of pendent appellate jurisdiction, this Court may exercise "pendent" appellate jurisdiction over an otherwise

nonappealable ruling if the ruling is "inextricably intertwined" with a claim properly before the Court on interlocutory appeal or "if review of the pendent issue was necessary to ensure meaningful review of the independently reviewable issue." *Cunningham v. Gates*, 299 F.3d 1271, 1284 (9th Cir. 2000); *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35, 51 (1995).

"Inextricably intertwined" is consistently interpreted "very narrowly." *Id.* "[A] rule loosely allowing pendent appellate jurisdiction would encourage parties to parlay … collateral orders into multi-issue interlocutory appeal tickets." *Swint*, 514 U.S. at 49-50.

This Court should decline to exercise pendent appellate jurisdiction over the district court's denial of summary judgment on the state-law claims. *Liberal v. Estrada*, 632 F.3d 1064, 1074 (9th Cir. 2011) (declining to exercise pendent jurisdiction over state-law claims in interlocutory appeal of denial of qualified immunity); *accord Atencio v. Arpaio*, 674 F. App'x 623, 627 (9th Cir. 2016) (unpublished). Review of the state-law claims is not "inextricably intertwined" with review of issues that this Court has jurisdiction to review (whether the law was clearly established on Plaintiff's federal claims). Nor is review of the

state-law claims necessary for "meaningful review" of the "independently reviewable issue." Defendants do not argue otherwise. Defs.' Br. at 59-62 (reciting standard and contesting facts).

The fact that the state-law claims rest on the same core of facts does not provide this Court with pendent appellate jurisdiction. "[M]ore is required than that separate issues rest on common fact." *United States v. Oakland Cannabis Buyers' Coop.*, 190 F.3d 1109, 1113 (9th Cir. 1999). Plaintiff's state-law claims involve different elements than Plaintiff's federal claims and therefore are not inextricably intertwined. *Cunningham*, 229 F.3d at 1285 ("Two issues are not 'inextricably intertwined' if we must apply different legal standards to each issue.").[6]

In sum, the Court cannot exercise pendent jurisdiction over the denial of summary judgment on the state-law claims.

---

[6] The elements of Plaintiff's Fourth Amendment claim and state-law malicious prosecution claim differ. In order to prove her Fourth Amendment claim, Plaintiff need only demonstrate that her detention was without probable cause and Defendants proximately caused the unlawful detention. *Manuel*, 137 S. Ct. at 918-19. In order to prove malicious prosecution, Plaintiff must show "(1) want of probable cause to initiate the prior criminal proceeding; (2) malice; (3) termination of the prior criminal proceedings; and (4) damage." *Mantia v. Redisi*, 118 Nev. 27, 30 (2002).

## CONCLUSION

For the foregoing reasons, the Court should dismiss for lack of jurisdiction. Alternatively, the Court should affirm.

Respectfully submitted,

s/ Elizabeth Wang
Counsel of Record for Plaintiff-
Appellee Kirstin Blaise Lobato

David B. Owens
LOEVY & LOEVY
100 S. King St., # 100
Seattle, WA 98104
O: 312.243.5900
david@loevy.com

Elizabeth Wang
LOEVY & LOEVY
2060 Broadway, Suite 460
Boulder, CO 80302
O: 720.328.5642
elizabethw@loevy.com

Megan Pierce
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
O: 312.243.5900
megan@loevy.com

## STATEMENT OF RELATED CASES

The undersigned attorney or self-represented party states the following:

[X]    I am unaware of any related cases currently pending in this court.

[ ]    I am unaware of any related cases currently pending in this court other than the case(s) identified in the initial brief(s) filed by the other party or parties.

[ ]    I am aware of one or more related cases currently pending in this court. The case number and name of each related case and its relationship to this case are:

s/ Elizabeth Wang
Counsel of Record for Plaintiff-
Appellee Kirstin Blaise Lobato

# CERTIFICATE OF COMPLIANCE

I am the attorney or self-represented party.

This brief contains 13,982 words, including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a cross-appeal brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an amicus brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a death penalty case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

s/ Elizabeth Wang
Counsel of Record for Plaintiff-Appellee Kirstin Blaise Lobato

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2023, I electronically filed the

foregoing with the Clerk of Court using the ECF system, which will

electronically send notice to all counsel of record.

s/ Elizabeth Wang
Counsel of Record for Plaintiff-
Appellee Kirstin Blaise Lobato